**RYMES HEATING OILS, INC. Plaintiff,**

v.

**SPRINGFIELD TERMINAL RAILWAY, INC., Defendant.**

**No. CIV.A. 02–12448–WGY.**

United States District Court, D. Massachusetts.

May 30, 2003.

Robert B. Culliford, Springfield Terminal Railway, North Billerica, MA, Eric L. Hirschhom, Winston & Strawn, Washington, DC, for Springfield Terminal Railway Company, (Defendant).

Robert M. Thomas, Jr., Thomas & Associates, Boston, MA, for Rymes Heating Oils, Inc., (Plaintiff).

*MEMORANDUM AND ORDER*

YOUNG, Chief Judge.

## I. INTRODUCTION

The Plaintiff, Rymes Heating Oils, Inc. ("Rymes"), alleges that the defendant, Springfield Terminal Railway Co. ("Springfield"), wrongfully excluded competition from providing service to Rymes (Count One) and that Springfield failed to provide service upon a reasonable request (Count Two). The parties have filed cross-motions for summary judgment with respect to Count One.

### A. Facts

Rymes is a privately-held New Hampshire corporation engaged in the business of selling propane to residential, commercial, industrial, governmental, and other customers located in central and southern New Hampshire. Compl. ¶ 1. Springfield is a corporation engaged in the business of providing rail carrier services and is headquartered in North Billerica, Massachusetts. *Id.* ¶ 2.

#### 1. Dispute Origins: The Trackage Rights Order

The story of this lawsuit begins in 1988. In that year the Surface Transportation Board[1] (the "Board") issued a ruling respecting portions of the Connecticut River railway line ("Connecticut Line") owned by Boston and Maine Corporation ("Boston & Maine")[2], a common carrier by rail. *National Railroad Passenger Corporation [Amtrak]—Conveyance of Boston and Maine Corporation Interests in Connecticut River Line in Vermont & New Hampshire,* 4 I.C.C.2d 761 (1988) (hereinafter *"Amtrak I"*). In *Amtrak I,* the Board granted an application filed by the National Railroad Passenger Corporation ("Amtrak") under section 402(d) of the Rail Passenger Service Act (the "Passenger Service Act")[3]—45 U.S.C. § 562(d)—seek-

---

**1.** At the time that the Trackage Order was issued, the Surface Transportation Board was known as the Interstate Commerce Commission. For purposes of clarity, all references to the Interstate Commerce Commission or the Surface Transportation Board hereinafter will be to the "Board."

**2.** Springfield is the lessee and operator of the railroad owned by Boston & Maine.

**3.** Amtrak alone—as distinguished from freight railroads—has statutory authority under section 402(d) of the Passenger Service Act to acquire, by condemnation, rail lines owned by

ing conveyance to Amtrak of the 48.8–mile Connecticut Line and certain other property interests belonging to Boston & Maine. *Id.* To acquire the Board's approval, Amtrak suggested that Boston & Maine be granted trackage rights over the line after Amtrak's acquisition so that Boston & Maine could continue to provide common carrier freight service (which, as noted above, is now provided by Springfield). *Id.* at 767.

In addition, the Board granted in the consolidated proceeding the related petition of Central Vermont Railway, Inc. ("Central Vermont")[4] for exemption under 49 U.S.C. § 10505 from the requirements of the Interstate Commerce Commission Act—49 U.S.C. §§ 11343–11345—to acquire from Amtrak and to operate the Connecticut Line subject to the requirement that Amtrak grant specified trackage rights back to Boston & Maine. *Id.* at 763, 798–800. In other words, Central Vermont sought to acquire a portion of the line from Amtrak, pursuant to the Interstate Commerce Commission Act, and to grant trackage rights to Boston & Maine.

The Board decided in *Amtrak I* to leave the trackage rights agreement to negotiation by the parties. *Id.* at 798. Following that decision, the parties consummated the sale between Amtrak and Boston & Maine, but Boston & Maine and Central Vermont were unable to reach a final trackage rights agreement. Because of the failed negotiations as to the trackage rights agreement, Central Vermont petitioned the Board to resolve the dispute. The Board resolved the dispute in *National Railroad Passenger Corporation [Amtrak]—Conveyance of Boston and Maine Corporation Interests in Connecticut River Line in VT. & NH*, 6 I.C.C.2d 539, 539–40 (1990) (hereinafter "*Amtrak II*"). The Board imposed a trackage rights order (the "Trackage Order") in *Amtrak II*, which still governs. In pertinent part, the order states:

> 1.3 [Springfield] shall have the exclusive right to serve all existing shippers and shippers' facilities that were located on the [line] as of the Conveyance Date [September 9, 1988], including any and all new shippers that locate at such existing facilities after the Conveyance Date, provided that [Springfield] makes available a minimum three day per week service along the line. [Springfield] must consult with the shippers and ensure their needs are met with the three day per week service.

> \*   \*   \*   \*   \*   \*

> 1.3.3 [New England Central] shall be permitted to commence service to existing shippers and shippers facilities upon [Springfield's] failure to make available three day per week service during two weeks out of any four week period, unless such failure is excused by Section 9.6.

> \*   \*   \*   \*   \*   \*

> 9.6 Force Majeure. No party to this Agreement shall be responsible for delays or errors in its performance ... occurring by reason of circumstances beyond its control, including acts of civil or military authority, national emergencies, fire, mechanical breakdown, labor dis-

freight railroads. The Passenger Service Act also authorizes Amtrak to seek trackage rights over freight lines and to have the Board fix the terms and conditions of such rights, but Boston & Maine was unsuccessful in its attempt to persuade the Board that the Amtrak request to acquire ownership should be treated as a request for trackage rights. *Id.* at 770.

4. New England Central Railroad ("New England Central") is the successor to Central Vermont, which New England Central acquired in 1994.

putes, flood or catastrophe, acts of God, insurrection, war, riots, delays in suppliers, derailments or failure of transportation, communication or power supply. 6 I.C.C.2d at 560, 566.

### 2. Enter Rymes

Rymes purchased a building in Claremont, New Hampshire in 1995 for the purpose of opening a propane distribution center that would be served entirely by rail. Compl. ¶ 12. Rymes constructed railroad tracks to connect its distribution center to the Connecticut Line. *Id.* ¶ 7. The tracks that Rymes constructed, however, actually accessed an existing side track which, in turn, accessed the Connecticut Line. The existing side track accessed by Rymes had been in place at the time of the 1988 conveyance pursuant to *Amtrak I.* Accordingly, Springfield allegedly represented to Rymes that Springfield had the exclusive right to provide rail carrier service to Rymes' distribution center. *Id.* ¶ 14. The rail service Rymes received from Springfield was, according to Rymes, inconsistent and unreliable from 1996–2002. *Id.* ¶ 13. As a result, Rymes asserts that it was forced to construct a costly storage facility and acquire a fleet of trucks. *Id.*

In the fall of 2001, Rymes initiated proceedings before the Board seeking a declaration to allow it to seek alternative rail service at its distribution center. *Id.* ¶ 16. Rymes argued that it was not bound by the Trackage Order to ship exclusively through Springfield because it was not an "existing shipper" as described therein. On July 17, 2002, the Board ruled that Springfield's claim of exclusivity was "meritless" and that Rymes had the right to seek alternative rail service because Rymes had not been an existing shipper and had not located at an existing facility. *See* July 17, 2002 Board Decision (attached to Compl. as Ex. 1) at 5. Rymes acquired

such service from New England Central and states that such service is satisfactory. Compl. ¶ 19.

### B. Procedural Posture

Rymes filed its complaint in this Court on December 20, 2002. On January 27, 2003, Springfield moved to dismiss all claims. On February 19, 2003, this Court denied Springfield's motion to dismiss. At the hearing, the Court invited motions and memoranda supporting summary judgment as to Count One, and the Court deferred the question of whether Count Two of the complaint should be referred to the Surface Transportation Board. The parties made cross-motions for summary judgment with respect to Count One. This Court held a hearing on the cross-motions for summary judgment on April 8, 2003. At that hearing, the parties agreed to treat the issue of liability with respect to Count One as a case stated. On April 16, 2003, the Court ordered Rymes to identify clearly—through additional filings—(1) the "act" or conduct in question undertaken by Springfield; and (2) the precise duty—including the legal source of that duty—breached thereby. Springfield was given the opportunity to respond. Pursuant to the Court's order, both parties have submitted additional briefs.

## II. DISCUSSION

█ Rymes framed the allegation embodied in Count One of the complaint as "wrongful[ ] exclu[sion]" of competition from service. In its Order, the Board declared that "Rymes is entitled to obtain competitive service from NECR." *See* July 17, 2002 Board Decision at 5. It made no findings or declarations, however, with respect to any *past* action that Springfield may or may not have taken wrongfully to exclude competition, that is, to harm Rymes prior to the issuance of the Order.

Notwithstanding (1) the derivation of Springfield's trackage rights pursuant to *Amtrak II* at 539–40; (2) the applicability of the Carmack Amendment to Rymes' claims; or (3) whether the Interstate Commerce Commission Termination Act, 49 U.S.C. § 11704(b) (2000), provides a party the right to seek damages for violations of Board orders, Rymes did not squarely present the "act or omission" by Springfield alleged in the complaint. Rymes merely relied on the Board's Order as providing the basis for Springfield's liability, but, as discussed above, the Order only embodies declaratory—that is, *prospective*—relief.

Perceiving no ostensible legal cause of action, the Court ordered Rymes to clarify the specific legal basis on which it seeks recovery because "wrongful exclusion" is vague and insufficient. Notwithstanding Rymes' persistent attempts to interpolate duties owed to it by Springfield under *Amtrak II,* the sole colorable claim Rymes now makes is a contractual breach of an implied duty of good faith and fair dealing by Springfield pursuant to its obligations under *Amtrak II.* Pl.'s Supplemental Mem. [Docket No. 34] at 6–8. Even assuming, however, that *Amtrak II,* an *order* by the Board, constitutes a "contract" under Massachusetts law—an issue about which this Court expresses no opinion—Springfield owed no implied contractual duty of good faith and fair dealing to Rymes.

Because Rymes was not a "party" to *Amtrak II,* Rymes must be a third-party beneficiary to recover under the "contract." To recover as a third-party beneficiary, Rymes must show that it was an *intended* beneficiary and not merely incidental. *Spinner v. Nutt,* 417 Mass. 549, 555, 631 N.E.2d 542 (1994). An intended third-party beneficiary is one to whom the contracting parties intended to give the benefit of the promised performance. *Anderson v. Fox Hill Village Homeowners Corp.,* 424 Mass. 365, 366, 676 N.E.2d 821 (1997). To determine whether an entity is an intended beneficiary, courts "look at the language and circumstances of the contract for indicia of intention" and the "intent must be clear and definite."[5] *Id.* at 366–67. In the instant case, the "contracting" parties under *Amtrak II* are Springfield, standing in the shoes of Boston & Maine, and New England Central, as successor in interest to Central Vermont. *Amtrak II* establishes rights as between Springfield and New England Central to serve "shippers"—that is, the "agreement" serves to allot trackage rights over the Connecticut Line as between two providers of rail service. Rymes does not explain how it is an intended beneficiary and states only that it cannot "be viewed as a stranger or disinterested party to the trackage rights agreement." Pl.'s Supplemental Mem. at 7. There is certainly no "clear and definite" intent embodied in *Amtrak II* to benefit Rymes, as Massachusetts law requires.[6]

**5.** The Restatement (Second) of Contracts § 302 (1981) provides:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

**6.** An example of a case in which the Supreme Judicial Court of Massachusetts held that a plaintiff *was* a third-party beneficiary is *Rae v. Air–Speed, Inc.* There, the contract was between an employer and an insurance agent; the insurance agent was to procure workers' compensation insurance. 386 Mass. 187,

It strains credulity to argue that New England Central engaged Springfield to perform for the benefit of Rymes; rather, the Board circumscribed the carriers' rights to use the railroad in question for commercial purposes. That Rymes or any other shipper may have benefitted from this "agreement" is merely incidental and not intended. *See, e.g., Plymouth Housing Auth. v. Town of Plymouth*, 401 Mass. 503, 505, 517 N.E.2d 470 (1988) (holding that local housing authority that purchased site of proposed elderly housing was an incidental, not intended, beneficiary of contract between town and building removal contractor for removal of buildings on site that were not conveyed to the authority). Moreover, to the extent Rymes suggests that *the Board* "intended" to benefit shippers such as Rymes by imposing the specific allocation of rights under *Amtrak II*, Rymes undermines its contention that *Amtrak II* constitutes a "contract" under which it may recover. The intent of the Board in binding two parties cannot fairly constitute a legally-enforceable *agreement* between two private parties.

Prudentially, a ruling that Rymes' theory lacks a cause of action is well-grounded. If Rymes were adjudged an intended third-party beneficiary, the reductio ad absurdum of the implicated logic would be to hold *any* potential customers of any set of contracting businesses that seek to share a given market to be intended third-party beneficiaries of that contract. The law of contracts does not extend so far, and this Court declines to forge such an imprudent path.

Rymes argues that the result of denying relief as to Count One is somehow unfair because it allows Springfield falsely to assert a monopoly position over Rymes and others like it without consequence. The Court rejects such a fatalist view. First, Rymes and others can seek relief from the Board; indeed, Rymes successfully petitioned the Board in this case. Furthermore, although the Court expresses no view as to the viability of such claims, Rymes, for example, might have sought damages at common law for misrepresentation or unfair business practices against Springfield. Finally, Rymes' other arguments attempting to establish some vague theory of recovery for "wrongful exclusion" are unavailing. Rymes cannot merely invoke the broad federal statutory regulation of the railroads and hope to prevail without articulating the precise legal grounds for its claim.

## III. CONCLUSION

Accordingly, Springfield's Motion for Partial Summary Judgment (with respect to Count One) [Docket No. 18] is ALLOWED; Rymes' Motion for Partial Summary Judgment (with respect to Count One) [Docket No. 15] is DENIED.

SO ORDERED.

---

194, 435 N.E.2d 628 (1982). As such, the specific object of the contract in *Rae* was the benefit to the employer's workers, and the court thus held that the employees were third-party beneficiaries. *Id.* at 195, 435 N.E.2d 628. No such specific object exists in the instant case.