**RADFORD TRUST, Plaintiff,**

v.

**FIRST UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant.**

**No. CIV.A.02–12477–WGY.**

United States District Court, D. Massachusetts.

June 15, 2004.

228

Mark E. Porada, Christopher T. Roach, Geraldine G. Sanchez, Pierce Atwood, Portland, ME, for Defendant.

Warren H. Pyle, Pyle, Rome & Lichten, & Ehrenberg, P.C., Boston, MA, for Plaintiff.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

This is an action under the Employment Retirement Security Act of 1974, codified as amended at 29 U.S.C. §§ 1001–1461 (ERISA).[1] The plaintiff, Radford Trust ("Radford"), alleged that the defendant, First Unum Life Insurance Company of America ("First Unum"), had wrongfully denied benefits owed to Radford's beneficiary, John Doe ("Doe") (who assigned his claim to Radford), under a group long term disability policy (the "Policy") that First Unum managed for Doe's former employer, New York City law firm Hawkins, Delafield & Wood ("Hawkins"). Radford's action sought damages, costs, and attorney's fees. First Unum maintained that its denial of benefits was proper, arguing that Doe had failed to establish that he was disabled before his coverage under the Policy was terminated. The company further argued that when Doe released all claims against Hawkins, he also released any claims against First Unum. Because Radford could only recover to the extent of Doe's rights, First Unum's arguments would require summary judgment in its favor. Finally, First Unum urged that should the Court hold that First Unum reached its decision incorrectly, the proper course would be remand to First Unum for further proceedings. The parties filed cross motions for summary judgment, and then stipulated that this case might be treated as a case stated. *See* Pl.'s Stip. [Doc. No. 34]; Def.'s Stip. [Doc. No. 33].[2] This is a helpful procedure wherein the parties agree that the summary judgment record constitutes the entire case and the Court may draw such inferences therefrom as are reasonable. Where facts are in dispute, the Court notes each party's contentions, and when necessary makes a determination as would an ordinary factfinder, without presumptively drawing inferences in either party's favor. *See Boston Five Cents Sav. Bank v. Secretary of Dep't Hous. & Urban Dev.,* 768 F.2d 5, 11–12 (1st Cir.1985). This Court has used the technique to good effect.[3]

---

1. Radford has agreed to drop its claim in Count II of the Complaint for relief under Mass. Gen. Laws ch. 93A. *See* Pl.'s Mem. Opp'n [Doc. No. 17] at 1.

2. First Unum signed the stipulation but added a footnote, preserving its objection to Radford's motions to supplement the administrative record compiled by First Unum [Doc. Nos. 18, 23]. *See* Def.'s Stip. Radford filed its signed stipulation after First Unum filed its signed stipulation, without commenting on this reservation, although it is unclear whether Radford had an opportunity to see First Unum's reservation before submitting its own signed stipulation. *See* Pl.'s Stip. The Court holds that the footnote does not change the meaning of the stipulation or otherwise render the stipulation unenforceable. No reasonable person would have interpreted the document's text as waiving any right to challenge the Court's resolution of the case or any aspect thereof, including any decision to supplement the record. The parties were merely agreeing that the Court should not apply the summary judgment standard. In any case, although the Court allowed Radford's two motions to supplement the administrative record [Doc. Nos. 18, 23] on October 23, 2003, the Court has in no way relied on those supplemental materials in reaching its decision.

3. *See, e.g., Cosme v. Salvation Army,* 284 F.Supp.2d 229 (D.Mass.2003); *Rymes Heating Oils, Inc. v. Springfield Terminal Ry., Inc.,* 265 F.Supp.2d 147 (D.Mass.2003); *Laurenzano v. Blue Cross & Blue Shield of Mass., Inc.,* 191 F.Supp.2d 223 (D.Mass.2002); *Watson v. Deaconess Waltham Hosp.,* 141 F.Supp.2d 145 (D.Mass.2001); *Stein v. United States,* 135 F.Supp.2d 265 (D.Mass.2001); *Cabral v. St. Paul Fire & Marine Ins. Co.,* 59 F.Supp.2d 190 (D.Mass.1999); *United Cos. Lending Corp.*

The Court issued an order and judgment on March 31, 2004, finding facts, declaring the respective rights of the parties in light of these findings, and entering judgment for Radford. The Court further held that Radford was entitled to costs, attorney's fees, and prejudgment and post-judgment interest. This opinion explains the Court's reasoning, amends its holding with regard to the date of accrual for prejudgment interest, and addresses Radford's Motion to Amend Judgment [Doc. No. 39].

## I. INTRODUCTION

### A. Factual Background

The facts in this case can be found in several documents: (i) First Unum's Statement of Undisputed Material Facts of Record [Doc. No. 14] ("Def.'s 56.1 Stmt."); (ii) Doe's response thereto [Doc. No. 19] ("Pl.'s 56.1 Stmt."); (iii) First Unum's Response to Doe's Undisputed Statement of Material Facts [Doc. No. 22] ("Def.'s Resp."); and (iv) written documents that speak for themselves, as compiled in First Unum's administrative record [Doc. No. 14] ("R."). Because Doe, not Radford, is the real party in interest here, the Court does not distinguish between Doe's contentions and Radford's, and refers to all contentions made by either as Doe's contentions.

#### 1. The Policy

The Policy provided benefits for "disabled" employees. Def.'s 56.1 Stmt. ¶ 1;

R. at FULCL00687–63 (copy of the Policy). The Policy stated:

"Disability" and "disabled" mean that because of injury or sickness:

1. the insured cannot perform each of the material duties of his regular occupation; or

2. the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:

 a. performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and

 b. earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness.

Note: For attorneys, "regular occupation" means the specialty in the practice of law which the insured was practicing just prior to the date disability started. R. at FULCL00677.[4]

With respect to payments made for disability, the Policy provided:

When [First Unum] receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, [First Unum] will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives to [First Unum] proof of continued:

1. disability; and

---

*v. Sargeant*, 20 F.Supp.2d 192 (D.Mass.1998); *Williams v. Hanover Hous. Auth.*, 871 F.Supp. 527 (D.Mass.1994); *Rossi v. Boston Gas Co.*, Civ. A. No. 88–0079–WGY, 1994 WL 548101 (D.Mass. July 7, 1994); *Rubin v. Brooks/Cole Publ'g Co.*, 836 F.Supp. 909 (D.Mass.1993); *Zappia v. NYNEX Info. Resources Co.*, Civ. A. No. 90–11366–Y, 1993 WL 437676 (D.Mass. Oct.22, 1993); *Skinner v. Boston Hous. Auth.*,

690 F.Supp. 109 (D.Mass.1988), *rev'd on other grounds*, 873 F.2d 1433 (1st Cir.1989) (unpublished table decision).

4. Doe does not assert that section 2, regarding part-time status, is applicable in this case. The Court notes that associates like Doe are "Class 2" employees under the Policy. R. at FULCL00685.

2. regular attendance of a physician. *Id.* at FULCL00675.

The "elimination period" was "a period of [180] consecutive days of disability for which no benefit is payable ... and begins on the first day of disability." *Id.* at FULCL00681; *id.* at FULCL00685 (specifying 180 days). "If disability stops during the elimination period for any 14 (or less) days, then the disability will be treated as continuous." *Id.* at FULCL00681. "Benefits for disability due to mental illness will not exceed 24 months of monthly benefit payments," except in circumstances not relevant here. *See id.* at FULCL00670. " 'Mental illness' means mental, nervous or emotional diseases or disorders of any type." *Id.*

The Policy provided that an "employee will cease to be insured on the earliest of the following dates" (other possible cessation events are not relevant here):

2. the date the employee is no longer in an eligible class;

. . .

5. the date employment terminates. Cessation of active employment will be deemed termination of employment, except:

a. the insurance will be continued for a disabled employee during:

i. the elimination period; and

ii. while benefits are being paid.

*Id.* at FULCL00669. "Active employment" was defined to mean that "the employee must be working ... for the employer on a full-time basis and paid regular earnings (temporary or seasonal employees are excluded) [and] at least [30] hours [per week]." *Id.* at FULCL00681; *id.* at FULCL00685 (specifying 30 hours per week).

### 2. Doe's Schizophrenia

In 1993 and 1994, Doe was under treatment for schizophrenia, and was hospitalized twice for that condition. Pl.'s 56.1 Stmt. ¶ 115. In 1995, after his schizophrenia was no longer acute, he took the Law School Aptitude Test, with accommodations based on his mental illness. *See* R. at FULCL00354.[5] Doe began working as a full-time associate for Hawkins on September 8, 1998, and First Unum's coverage of Doe under the Policy became effective on October 1, 1998. Pl.'s 56.1 Stmt. ¶ 117.[6]

According to Doe, his symptoms returned over the course of the next year, eventually making him unable to perform his work duties satisfactorily. Both parties acknowledged the content of the progress notes written by Dr. Sarita Singh (whom Doe saw on June 22, 1999), which stated:

> During the year [Doe] worked, he gradually became increasingly fearful of being sexually assaulted. It got to the point that he feared getting on the elevator to get to his office. His concentration worsened. His sleep became irregular, his appetite worsened to the point that all he could eat was bread. He has auditory hallucinations about 1x/wk....

---

5. Although the parties characterized the accommodation differently, both agreed that Doe was given accommodations and both referred to the same record document, a confirmatory letter from Kirsten C. Schneller of the Law School Admission Council. *See* Pl.'s 56.1 Stmt. ¶ 116; Def.'s Resp. ¶ 116.

6. First Unum stated that Hawkins also employed Doe part-time from January 26, 1998 until June 5, 1998. Def.'s Resp. ¶ 117; R. at FULCL00047. Doe had no opportunity to confirm or deny this. If anything, this showed that after having an opportunity to evaluate Doe's work, at a time when his schizophrenia did not impact his performance, Hawkins considered him sufficiently capable that they hired him.

He says he has no contact with his family and has very few friends.

R. at FULCL00129.[7] First Unum claimed that the medical records attached to Dr. Singh's report, which showed that Doe had received no treatment since 1994, demonstrated that Doe "apparently had been treatment free and fully functioning in society since that time." Def.'s Resp. ¶ 124. On his First Unum claim form, dated October 1, 1999, Doe listed April 20, 1999 as the "[l]ast day [he] worked before [his] disability," and listed April 21, 1999 as the "date [he] was first unable to work." Pl.'s 56.1 Stmt. ¶ 20.[8]

### 3. Hawkins's Termination of Doe

The parties disagreed as to the nature and significance of the facts surrounding the precise timing and circumstances of Doe's termination. According to the Record, Hawkins and Pettina Plevan ("Plevan"), outside counsel for Hawkins, reported to First Unum on several occasions that Doe's last day of work was April 26, 1999. *See* R. at FULCL00047 (Long Term Disability Claim Employer's Statement); *id.* at FULCL00277 (First Unum's log of a call from Plevan to First Unum, which has her stating that "[Doe] was told on 4/26/99 that his services were no longer required and that he should look for another position"); *id.* at FULCL00283 (First Unum's log of a phone call from Plevan to First Unum, which has her reconfirming that April 26, 1999 was Doe's last day of work).

The Record also contained evidence that Doe's employment continued beyond that date, however. Both parties agreed that Doe continued to receive weekly paychecks until June 30, 1999. *See* Pl.'s 56.1 Stmt. ¶ 122; Def.'s Resp. ¶ 122. Doe interpreted this as meaning that he was actively employed through June 30, 1999, an understanding he affirmed in a release he signed with Hawkins after settling a disability discrimination suit he brought against the firm. Def.'s 56.1 Stmt. ¶ 52; R. at FULCL00237. First Unum pointed to statements by Plevan that payment after April 26, 1999 was part of a "severance package." Def.'s Resp. at 122 (citing R. at FULCL00277 and FULCL00283). Doe noted, however, that Hawkins continued to pay First Unum premiums for long term disability coverage though June 30, 1999, premiums were based on "total covered payroll" (defined as "basic monthly earnings"), Doe received weekly paychecks through June 30, 1999, the pay stubs (except one check for unused vacation) showed Hawkins as deducting SUI/SDI taxes through that date, and New York state law made those taxes deductible "on all wages paid." Pl.'s 56.1 Stmt. ¶ 122 (citing N.Y. Labor Law § 570 (McKinney 2003), and R. at FULCL00258–64, FULCL00283, and FULCL00682). First Unum admitted all this, except that it characterized the weekly pay as "severance pay," and it "den[ied] that deduction of SUI/SDI taxes equates with active employment as defined in the Policy." Def.'s Resp. ¶ 122. First Unum argued at the November 3, 2003 summary judgment hearing (although not in any of its filings) that it was "not clear" whether Hawkins

---

**7.** Radford actually misquoted Dr. Singh's notes, and First Unum admitted that this (misquoted) text was in her notes, but the mistakes are not material. *See* Pl.'s 56.1 Stmt. ¶ 118; Def.'s Resp. ¶ 118. The Court quotes Dr. Singh's notes directly.

**8.** First Unum characterized Doe' statements differently ("[Doe] reported in his employee's

statement that his last day of work was April 20, 1999, and that he was first unable to work on April 21, 1999."), but cited the same form that Doe did. Def.'s 56.1 Stmt. ¶ 20; *see* R. at FULCL00045. First Unum disputed neither the accuracy of Doe's quotation nor the authenticity of the employee statement.

had paid premiums for Doe through June 30, 1999, and that if it had, and First Unum had failed to reimburse Hawkins, such failure was due to "inadvertence and neglect," and thus did not constitute an admission that Doe was an employee through that date. 11/03/03 Hr'g Tr. Doe obviously views Hawkins's continuing tax and insurance payments as evidence that Hawkins considered him to be an active employee through June 30, 1999, and believes First Unum's receipt and continued retention of those premium payments constituted an acknowledgment and admission that Doe was actively employed through that date. *See id.*

Doe's time sheets, provided to First Unum by Hawkins, gave further evidence of his employment beyond April 26, 1999. Both parties acknowledged that Doe's time sheets for Hawkins recorded him 'as working: 28 hours on "non-billable office matters" and 0.3 billable hours the week beginning April 26, 1999; 35 nonbillable and 0.5 billable hours the week beginning May 3, 1999; 35 nonbillable hours the week beginning May 10, 1999; and 27.8 nonbillable and 7.2 billable hours the week beginning May 17, 1999. Def.'s 56.1 Stmt. ¶ 85 (citing R. at FULCL00362–65); Pl.'s 56.1 Stmt. ¶ 85. There was no evidence in the Record of any work after May 21, 1999. Def.'s 56.1 Stmt. ¶ 86; Pl.'s 56.1 Stmt. ¶ 86.

A December 5, 2000 letter from Plevan to First Unum stated that "it is likely that [Doe] continued to come to the office until early June," and that it was "ambiguous" when he ceased working. R. at FULCL00326. A July 12, 2001 letter from Plevan to Doe reiterated this, and also conveyed that Hawkins's earlier statement that April 26, 1999 was Doe's "last day 'actually worked' … was based on our understanding of the facts, *i.e.*, that you stopped doing work before you ceased being an employee." *Id.* at FULCL00539.

In a June 18, 2001 memorandum, Doe informed Hawkins and First Unum that he did not recall Hawkins giving him a specific date to vacate his office. R. at FULCL00484.

A May 28, 1999 memorandum from Samuel Hellman ("Hellman"), a partner at Hawkins, to Doe stated:

> [I]t is apparent that you have not needed the services of the firm during the past month. Thus, after additional consideration, it is suggested that the firm merely pay you until the end of June and that we forward any personal items still in the office to you at your apartment address or such other location as you request. We will be happy to continue to answer any phone calls directed to you and take messages on your behalf. This will allow you to focus on your job hunting.

R. at FULCL00349. In addition, the memo made reference to payments that would be deducted from Doe's "severance pay," but it did not specify the nature of that severance pay. *Id.* at FULCL00349–50.

Doe argued that this evidence showed that he had worked at least through May 21, 1999. First Unum, however, characterized the logged hours as "mechanically record[ed]," Def.'s Opp'n [Doc. No. 21] at 11, and as "mostly non-billable time" with "minimal" billable hours, Def.'s 56.1 Stmt. ¶ 89 (quoting R. at FULCL00389). In First Unum's view, under the circumstances, the activities recorded in the time sheets did not qualify as "active employment" under the terms of the Policy.

The Court found that Doe was actively employed through May 21, 1999. It was undisputed that he was working until at least April 20, 1999, and his time sheets revealed that he was in the office doing work, some of it billable, until May 21, 1999. There could be little doubt that Doe

would have been treated as a Hawkins employee had any of the clients for whom he did billable work sued for, say, malpractice. There was no evidence that he was not engaged in work-related activities during that time.

Hellman's May 28, 1999 memorandum is consistent with this finding. It made clear that Hawkins did not want Doe to come into work anymore after it issued, but it suggested that he had been working before then, although perhaps not very productively. The memorandum stated that "after additional consideration, it is suggested that the firm merely pay you until the end of June." R. at FULCL00349. This suggested a change in policy: *i.e.*, it would be better if Doe henceforth ceased active employment. The statement "it is apparent that you have not needed the services of the firm during the past month" may have suggested that the work he was doing was of little importance or of low quality, but it did not deny that he was in fact doing work-related activities in the office.

### 3. Impact of Doe's Schizophrenia on His Job

As has already been suggested, there was also dispute as to whether, when, and to what extent Doe's schizophrenia became more acute in the first half of 1999, and whether, under the terms of the Policy, he was "disabled" at a time when the Policy covered him. The parties agreed as to what Doe's doctors had stated, but disagreed as to the significance and evidentiary weight of those statements.

On May 21, 1999, Doe met with Dr. Julian Klapowitz ("Dr.Klapowitz") for the purpose of completing some immunization forms, and he mentioned his schizophrenia to Dr. Klapowitz. Pl.'s 56.1 Stmt. ¶ 123 (citing R. at FULCL00092–93); *see* Def.'s Resp. ¶ 123 (admitting that Doe mentioned his schizophrenia during the visit, but emphasizing that the visit's only purpose was "for [Doe] to fill out his immunization records for his admission to the Massachusetts Institute of Technology"). At that time, Dr. Klapowitz wrote in his notes that he would "assist getting [Doe] plugged in to Medicaid psych." Pl.'s 56.1 Stmt. at 123 (quoting R. at FULCL00093).

On June 22, 1999, Doe consulted Dr. Sarita Singh ("Dr.Singh") about his schizophrenia. Pl.'s 56.1 Stmt. ¶ 118; Def.'s 56.1 Stmt. ¶ 118; R. at FULCL00129. A year later, Doe would explain his delay in seeking treatment to First Unum's customer care representative as resulting from a dislike of treatment and a fear of being "branded." *See* Def.'s 56.1 Stmt. ¶ 40 (citing R. at FULCL00056); *id.* ¶ 41 (citing R. at FULCL00054). Doe's father also attributed the delay to the debilitation caused by Doe's schizophrenia and depression. Def.'s 56.1 Stmt. ¶ 76 (citing R. at FULCL00315). Dr. Singh's progress notes, quoted at length above, described acute symptoms, so the explanation that Doe and his father gave was more than credible. Dr. Singh prescribed medications and met with Doe again on June 29, and July 12, 1999. Pl.'s 56.1 Stmt. ¶ 118; Def.'s 56.1 Stmt. ¶ 118; R. at FULCL00128–29. Subsequently, on August 30, 1999, Doe saw Dr. David Henderson ("Dr.Henderson"), a psychiatrist at the Massachusetts Institute of Technology. Def.'s 56.1 Stmt. ¶ 32. Dr. Henderson made a diagnosis commensurate with that of Dr. Singh, *see id.* ¶¶ 33–34, and stated that Doe "has a chronic illness that is not responding to treatment. He is unable to work as a lawyer." *Id.* ¶ 34 (quoting R. at FULCL00023).

Doe claimed that his symptoms had become sufficiently acute by April 1999 that they made him unable to perform his duties satisfactorily, and that his schizo-

phrenia was in fact the reason that Hawkins fired him. The claim for long term disability benefits that Doe filed with First Unum stated that he first began to notice symptoms of concentration difficulty and paranoia on or about March 1, 1999. Pl.'s 56.1 Stmt. ¶ 125; R. at FULCL00045. Doe claimed that his growing difficulties with schizophrenia ultimately led to the termination of his employment with Hawkins.

Doe sent a memo to Hellman, dated May 25, 1999, in which he informed Hawkins that he had been "accommodated on the LSAT after producing a diagnosis of schizophrenia" and asked "whether any dissatisfaction" with his job performance "can be traced to such condition." Def.'s 56.1 Stmt. ¶ 6; R. at FULCL00355. The closest Hawkins came to answering that question was in Hellman's May 28, 1999 memo, which stated that "we believe that your abilities may be better used in an area of the law other than public finance." R. at FULCL00350. Doe notified Hawkins by memorandum addressed to Hellman and dated July 7, 1999 (the "July 7, 1999 Memo") that he intended to file a disability discrimination lawsuit against Hawkins. Def.'s 56.1 Stmt. ¶¶ 8–9; R. at FULCL00341–46. Attached to the July 7, 1999 Memo was a draft EEOC complaint in which Doe stated: "I have been diagnosed with schizophrenia. My employer, Hawkins, Delafield and Wood ended employment either for schizophrenia or manifestations of it." Def.'s 56.1 Stmt. ¶ 10 (quoting R. at FULCL00344). On January 18, 2000, Doe settled his claims against Hawkins for $10,000. Def.'s 56.1 Stmt. ¶ 13; Pl's 56.1 Stmt. ¶ 13. In the settlement agreement, Doe "acknowledge[d] and confirm[ed] that [Doe's] employment with the firm ended effective as of June 30, 1999." Def.'s 56.1 Stmt. ¶ 14 (quoting R. at FULCL00267); see Pl.'s 56.1 Stmt. ¶ 14 (admitting to the release's text, but em-

phasizing that under the release *both* Hawkins and Doe agreed that Doe "acknowledges and confirms" his effective termination date). The release also stated: "This Agreement does not constitute an admission that [Hawkins] has violated any law or committed any wrong whatsoever." R. at FULCL00266.

First Unum's own file review, dated October 11, 2000, stated that "[Doe] was terminated due to inability to handle the workload, poor attention, poor concentration and diminished social interactions." Pl.'s 56.1 Stmt. ¶ 120 (quoting R. at FULCL00231) (internal quotation marks omitted); Def.'s Resp. ¶ 120.

First Unum consistently maintained both before and during this litigation that Doe could not be regarded as having been disabled before his June 22, 1999 visit to Dr. Singh, and that his coverage had ceased on April 26, 1999, when, according to First Unum, Doe's active employment ended. Doe argued that the evidence demonstrated that he was disabled before April 26, 1999, and therefore covered when he became disabled, and moreover that he had been actively employed until June 30, 1999 (or at least until May 21, 1999), thus making it even clearer that he had been covered at whatever time he became disabled.

The Court found that Doe became sufficiently disabled that he could no longer perform his job duties by April 20, 1999. First, the medical diagnoses in the record confirmed that Doe became disabled some time in the first six months of 1999. Dr. Singh's notes from Doe's June 22, 1999 visit indicated that he was sufficiently mentally ill that he was unable to "perform each of the material duties of his regular occupation." That diagnosis was reconfirmed on subsequent visits to Dr. Singh and Dr. Henderson. As early as May 21,

1999, Dr. Klapowitz thought that Doe should be "plugged in to Medicaid psych." Pl.'s 56.1 Stmt. at 123. There was no evidence in the Record to controvert these diagnoses.

Second, Doe's work record suggested April 20, 1999 as the actual date of "disability." Doe consistently maintained before and during this litigation that this was the last day before his disability made him unable to work, and there was no evidence to the contrary. Shortly thereafter, on April 26, 1999, Hawkins told Doe to start looking for another job. First Unum's own investigation found that Doe was terminated due to "inability to handle the workload, poor attention, poor concentration and diminished social interactions," a list of failings that bore a striking resemblance to the outward manifestations of schizophrenia. The Court found that Doe's termination was caused by the onset of his disability, and that he was therefore necessarily disabled before his employment terminated. The Court did not in any way base this finding on the settlement between Hawkins and Doe, nor could it. *See* Fed.R.Evid. 408; *McInnis v. A.M.F., Inc.*, 765 F.2d 240, 247 (1st Cir. 1985).

### 4. Doe's Claim for Benefits under the Policy

On October 1, 1999, several months after Doe's employment with Hawkins ended, Doe filed his claim for long term disability benefits, and stated that he first began to notice symptoms of concentration difficulty and paranoia on or about March 1, 1999. Pl.'s 56.1 Stmt. ¶ 125; R. at FULCL00045. In his claim statement, Doe reported that the first medical attention he received for his condition was from Dr. Singh, Def.'s 56.1 Stmt. ¶ 18 (citing R. at FULCL00044), and the only other doctor Doe reported seeing was Dr. Henderson,

*id.* ¶ 19 (citing R. at FULCL00044). As stated above, Doe noted in the report that his "last day worked before the disability" was "04/20/99." Pl.'s 56.1 Stmt. ¶ 20.

Plevan submitted the employer's statement on Hawkins's behalf and indicated that Doe's last day of work was April 26, 1999, at which point he had been "terminated based on job performance." Def.'s 56.1 Stmt. ¶ 25 (quoting R. at FULCL00047) (internal quotation marks omitted). Dr. Singh filled out a long term disability claim physician's statement, dated June 30, 1999 and submitted by Doe, which indicated that Doe was first unable to work on April 20, 1999. *Id.* ¶ 27 (citing FULCL00013).

On June 22, 2000, First Unum's customer care representative called Doe to discuss his alleged disability. *Id.* ¶ 40 (citing R. at FULCL00056). As the Court has already noted, when Doe was asked why he failed to seek treatment prior to June 22, 1999, he responded that he "doesn't like" being treated by doctors, and fears being "branded." *Id.* ¶ 41 (quoting R. at FULCL00054). On July 28, 2000, First Unum called Plevan, who again stated that Doe's last day of work was April 26, 1999. *Id.* ¶ 42 (citing FULCL00075). *But see* Pl.'s 56.1 Stmt. ¶ 42 (admitting that Plevan made that statement, but pointing out that she later "corrected it to state that time sheets showed he worked for clients through May 21 and that he came to the office through early or mid-June").

On October 11, 2000, Theresa Sullivan ("Sullivan") conducted a medical review of Doe's claim for First Unum. Def.'s 56.1 Stmt. ¶ 46 (citing R. at FULCL00229–31). Sullivan noted that the medical data did "validate" a diagnosis of schizophrenia and also noted that Doe was undergoing biweekly meetings with Dr. Henderson. *Id.* ¶¶ 47, 49 (citing R. at FULCL00229 and FULCL00231). She concluded, however,

that Doe was "not under care of a physician" between April 21, 1999 and June 22, 1999 and thus that "[i]mpairments [were] not supported" for that time period. *Id.* ¶ 50 (quoting R. at FULCL00229) (alteration in original).

First Unum called Plevan on October 30, 2000 to clarify Doe's "last day worked." *Id.* ¶ 54 (citing R. at FULCL00274). Plevan responded that Doe "was told on 4/26/99 that his services were no longer needed & that he should look for another position." *Id.* ¶ 55 (quoting R. at FULCL00277) (internal quotation marks omitted). She explained that he was paid through June 30, 1999, as part of a "severance package." *Id.* (quoting R. at FULCL00277) (internal quotation marks omitted). Finally, Plevan stated that Doe "may [have] come into the office [after April 26, 1999] for a short period of time but was not working or assigned any work." *Id.* ¶ 56 (quoting R. at FULCL00277) (internal quotation marks omitted).

Sullivan conducted another medical review on behalf of First Unum on October 31, 2000 that reiterated her initial findings. *Id.* ¶¶ 58–59 (citing R. at FULCL00280). Glenn Higgins, a clinical neuropsychologist, conducted an additional medical review of Doe's claim file for First Unum on November 1, 2000, and agreed with Sullivan's assessment. *Id.* ¶¶ 61–62. Specifically, he said "[Dr. Singh's notes] provide the only medical evidence of recent medical status [but] do not offer evidence of work impairing restrictions and limitations on the date of disability (4/27/99)." *Id.* ¶ 61 (quoting R. at FULCL00281) (alteration in original) (internal quotation marks omitted). On November 3, 2000, Plevan reiterated that Doe "was terminated [and] not an active employee" as of April 26, 1999. *Id.* ¶ 62 (quoting R. at

FULCL00283) (internal quotation marks omitted).

On November 6, 2000, First Unum informed Doe that his claim for disability benefits was being denied. *Id.* ¶¶ 63–64 (citing R. at FULCL00285–87 and FULCL00296). First, it told him that an "employee will cease to be insured on . . . the date employment terminates," as mandated by the Policy. *Id.* a ¶ 65 (quoting R. at FULCL00286) (internal quotation marks omitted). First Unum acknowledged that Doe was "diagnosed with schizophrenia," *id.* ¶ 66 (quoting R. at FULCL00286) (internal quotation marks omitted), but stated:

> [W]e do not have any objective medical evidence to suggest that this medical condition restricts or limits you from performing the material duties of your occupation from your last day worked, April 26, 1999, to the date of your June 22, 1999 office visit with Dr. Singh. In addition, since your employment terminated on April 26, 1999, which is prior to your treatment, you were no longer in an eligible insurance class, as defined by your Policy. Therefore, it is our conclusion [that] benefits are not payable under your Policy.

*Id.* ¶ 67 (quoting R. at FULCL00286) (alteration in original) (internal quotation marks omitted).

Doe appealed First Unum's denial of benefits and his father, Bernard Doe, also submitted a letter, *id.* ¶ 74 (citing R. at FULCL00314–16), arguing that "neither did [Doe's] disability begin on June 22, 1999, nor his employment end on April 26, 1999." *Id.* ¶ 75 (quoting R. at FULCL00316) (internal quotation marks omitted). First Unum conducted another review of all pertinent information, including Doe's billing records, and concluded that Doe was "not in active employment as of April 27, 1999." *Id.* ¶ 91 (quoting R. at

FULCL00387) (internal quotation marks omitted). First Unum therefore affirmed its denial of benefits. *Id.* ¶ 93 (citing R. at FULCL00386).

Doe went on to make three additional appeals, all of which were denied. Doe's second appeal was by letter dated April 5, 2000. *Id.* at 94 (citing R. at FULCL00393). On the same date, Bernard Doe submitted a letter to First Unum, *id.* at 95 (citing R. at FULCL00397–98), urging that Doe worked more time than the Hawkins time records suggested "because '[Doe] billed for a tiny fraction of the time worked. To do otherwise would have been not only unethical, but for some matters pointless,' due to alleged billing caps." *Id.* ¶ 96 (quoting R. at FULCL00397). First Unum noted that "[Doe] did not provide any additional medical records or evidence that he satisfied the definition of disability contained in the Policy as of April 1999." *Id.* ¶ 97. By letter dated June 14, 2001, First Unum again affirmed its denial of benefits. *Id.* ¶ 98 (citing R. at FULCL00477). In that letter, First Unum stated:

> [S]ubsequent to April 26, 1999, you were not in active employment as required by the Policy. Further, the medical documentation in the file does not show that you were under the regular attendance of a physician as of April 26, 1999 and the medical evidence does not support restrictions or limitations at that time. Thus, you do not meet the definition of disability as defined by the Policy provisions and you are not entitled to disability benefits.

*Id.* ¶ 101 (quoting R. at FULCL00475) (internal quotation marks omitted). Doe's third appeal, by memorandum dated June 18, 2001, was denied by letter dated July 13, 2001. *Id.* ¶¶ 102, 105 (citing R. at FULCL00481–87 and FULCL00534).

Doe made a fourth appeal, by memorandum dated July 19, 2001, but in a letter dated the next day, First Unum refused to conduct a fourth appellate review. *Id.* ¶¶ 105, 108 (citing R. at FULCL00540 and FULCL00548).

## II. DISCUSSION

### A. Standard of Review

■ Courts review a denial of benefits under an ERISA-governed benefits plan *de novo,* unless the plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case the question is whether the denial was arbitrary and capricious. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 114–15, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Recupero v. New England Tel. & Tel. Co.,* 118 F.3d 820, 826–27 (1st Cir.1997). The Court agrees with the parties that the Policy gives First Unum no such discretionary authority, so a *de novo* standard applies.

*Recupero* further clarifies the terminology. Under *Recupero,* even in cases where the arbitrary and capricious standard of judicial review applies, review of decisions by plan administrators or fiduciaries "is also to be '*de novo* review' to assure compliance of the out-of-court decisionmakers with standards of conduct analogous to those applied to trustees under judicially developed law." 118 F.3d at 827. Thus, *Recupero* recognizes that there are two elements of judicial review in this context: the depth of the inquiry into the factual and legal bases for the decision under review, and the standard that decision must meet. In all ERISA cases, the inquiry should be searching, that is *"de novo,"* but in cases where an ERISA-governed plan gives the administrator or fiduciary discretion, the question is whether the decision under review was reasonable,

whereas in cases where no such discretion is vested, the question is whether the decision was correct.

■ The Court dwells on *Recupero* in part because it is easy to take statements made in that case out of context. For example, when the *Recupero* court stated that the phrase " '*de novo* review,' as used in the context of judicial review of out-of-court decisions of ERISA-regulated plan administrators or fiduciaries does not mean that a district court has 'plenary' jurisdiction to decide on the merits, anew, a benefits claim," it was apparently referring to cases where an administrator or fiduciary has discretion. *Id.* at 827. "Plenary" jurisdiction refers to a court's power to "disregard completely" the findings of an administrator or fiduciary and to "decide anew all questions of fact bearing on the merits of the benefits claim." *Id.* at 828. It appears that the *Recupero* court was simply clarifying that, even though courts examine the factual and legal bases of an administrator's or fiduciary's determination *de novo*, they are not empowered to overturn an incorrect but reasonable decision in cases where the plan vests the administrator or fiduciary with discretion. *See id.* at 827–28.

### B. Summary Judgment and Treatment as a Case Stated

Cases challenging denial of benefits under an ERISA-governed plan frequently reach a stage where the parties file cross motions for summary judgment. In many instances, however, resolution of the case rests primarily or exclusively on evaluation of the administrator's or fiduciary's decision in light of the record it had before it, a record that is typically already before the court at the summary judgment stage. Should such cases proceed past the summary judgment stage, the "trial" may well consist of nothing more than presentation of the administrative record to the same judge who considered it at the summary judgment stage, because neither party is likely to have a right to a jury trial. *See Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19, 24 & n. 4 (1st Cir.2003). Although the First Circuit has largely reserved questions regarding the availability of jury trials in ERISA cases, it has specifically held that jury trials are unavailable in cases where decision is based entirely on an agreed administrative record and an arbitrary and capricious standard applies. *Recupero*, 118 F.3d at 831–32.

■ ERISA cases based solely or even primarily on the administrative record are thus uniquely fit for pre-trial resolution. In fact, when an arbitrary and capricious standard of review applies and review is based solely on an agreed administrative record, summary judgment "is merely a mechanism for tendering the issues and no special inferences are to be drawn in favor of a plaintiff resisting in summary judgment." *Liston*, 330 F.3d at 24. In cases where a *de novo* standard of review applies, however, the ordinary summary judgment standard applies. *See Hughes v. Boston Mut. Life Ins. Co.*, 26 F.3d 264, 268 (1st Cir.1994); *see also Golden Rule Ins. Co. v. Atallah*, 45 F.3d 512, 517 n. 6 (1st Cir.1995) (noting that *Hughes* applied the summary judgment standard in such a case). Under that standard, the Court would have to view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 490, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

Often a court will encounter a situation where it could resolve the case if acting as a "neutral factfinder," but cannot resolve the case if it evaluates each of the cross motions for summary judgment under the ordinary standard. There is thus a temp-

tation to "cheat" a little—to apply the summary judgment standard more loosely than is appropriate in order to resolve these cases. Professor Arthur R. Miller has made a persuasive argument that federal courts in general have gotten too aggressive in using summary judgment and dismissal to dispose of cases, at the expense of litigants' right to their day in court and to a jury trial. *See* Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Cliches Eroding Our Day in Court and Jury Trial Commitments?*, 78 N.Y.U. L.Rev. 982 (2003). This Court shares Professor Miller's concerns.

Rather than risk creating bad summary judgment precedent that might bleed into other areas of the law, courts should urge the parties in ERISA benefits cases to agree to treat their case as a case stated. *See Boston Five Cents*, 768 F.2d at 11–12. This permits a court to decide a case based on a stipulated record, without applying the summary judgment standard. The court simply draws such inferences as are reasonable from the facts. Even in this case, where the parties did not agree about the scope of the record, they were able to agree that the summary judgment standard would not apply.

### C. The Public Responsibility of ERISA Plan Administrators and Fiduciaries, and the Role of the Courts

Before delving into the merits, some general comments about ERISA cases are in order. The decisions whether and how to ensure that disability does not lead to poverty are obviously of great societal importance. In this country, although we provide limited disability insurance through Social Security, we rely primarily on private insurance, typically in the form of disability benefits plans administered by insurance companies under contract with employers. A number of current trends suggest that if anything, the role of Social Security may diminish in the coming years, perhaps ultimately ceding the field entirely to private insurance.

The benefits of relying on private insurers to carry out this essential public function may be considerable, and Congress has obviously decided that they outweigh the costs. The profit motive may well drive private insurers to tailor plans to beneficiaries' needs, evaluate risk, and cut waste and inefficiency more effectively than a government bureaucracy would. The government can in many cases accomplish public purposes effectively through reliance on choice and competition.

There are also obvious drawbacks to relying on private insurers, however. Although the profit motive drives companies toward efficiency, it creates a substantial risk that they will cut costs by denying valid claims. The market is somewhat inapt to punish insurers for engaging in such practices, particularly if the denials are not too flagrant, because the complexity of the insurance market and the imperfect information available to consumers make it difficult to determine whether an insurer is keeping its costs down through legitimate or illegitimate means. An individual claimant who encounters an insurance company that is disposed to deny valid claims must struggle to vindicate his rights at a time when he is at his most vulnerable. Often a newly disabled person will simultaneously confront increased medical bills and either termination of employment or diminished pay.

The judiciary provides a check on these potential abuses; under ERISA, aggrieved claimants can seek redress in the courts of justice. Congress and the courts have made two decisions, however, that limit

this checking effect. The first is to place limitations on judicial review of plan administrators' and fiduciaries' decisions similar to the ones placed on judicial review of governmental agency action, even though, unlike officials in governmental agencies, administrators and fiduciaries are not answerable to the public or to elected officials. Second, and perhaps more troubling, the courts have interpreted ERISA to restrict or eliminate the role of juries in deciding disputes between claimants and insurers. *See Liston,* 330 F.3d at 24 & n. 4; *Andrews–Clarke v. Travelers Ins. Co.,* 984 F.Supp. 49, 63 & n. 74 (D.Mass.1997). In the process, they have removed one of the most important guarantees of fairness in the judicial process.

It is the jury to which the founders of this nation turned to fill the role of impartial fact finder. Its primacy is guaranteed by the Constitution,[9] and the American jury system is our most vital day-to-day expression of direct democracy.[10] There is no other routine aspect of our civic existence today where citizens themselves are the government. Moreover, beyond involving citizens directly in one of the most fundamental processes of government, the jury system "injects community values into judicial decisions" and "allows equitable resolution of hard cases without setting a legal precedent."[11] Moreover, jurors' "very inexperience is an asset because it secures a fresh perception of each trial, avoiding the stereotypes said to infect the judicial eye."[12] In Massachusetts, Mme. Justice Abrams has summed up the jury's enormous contribution as follows:

> [T]he jury system provides the most important means by which laymen can participate in and understand the legal system. "It makes them feel that they owe duties to society, *and that they have a share in its government.* . . . The jury system has for some hundreds of years been constantly *bringing the rules of law to the touchstone of contemporary common sense.*"[13]

Without juries, the pursuit of justice becomes increasingly archaic, with elite professionals talking to others, equally elite, in jargon the eloquence of which is in direct proportion to its unreality. Juries are the great leveling and democratizing element in the law. They give it its authority and generalized acceptance in ways that imposing buildings and sonorous openings cannot hope to match. Every step away from juries is a step which ultimately weakens the judiciary as the third branch of government.[14]

**9.** U.S. Const. art. III, § 2, cl. 3; *id.* amends. VI, VII.

**10.** *See Powers v. Ohio,* 499 U.S. 400, 406–07, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (quoting passages from 1 Alexis de Tocqueville, *Democracy in America* 334–37 (Schocken 1st ed.1961)).

**11.** Note, *The Right to a Jury Trial in Complex Civil Litigation,* 92 Harv. L.Rev. 898, 898 (1979).

**12.** *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 355, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dissenting) (quoting H. Kalven & H. Zeisel, *The American Jury* (1966)) (internal quotation marks omitted).

**13.** *Commonwealth v. Canon,* 373 Mass. 494, 516, 368 N.E.2d 1181 (1977) (Abrams, J., dissenting) (alteration and emphasis in original) (quoting 1 W. Holdsworth, *A History of English Law* 348–49 (3d ed.1922)) (internal quotation marks omitted), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1510, 55 L.Ed.2d 531 (1978).

**14.** Hennessey, Clay & Marvell, *Complex and Protracted Cases in State Courts* (National Center for State Courts, 1981). Indeed, it may be argued that the moral force of judicial decisions—and the inherent strength of the third branch of government itself—depends in no small measure on the shared perception that democratically selected juries have the final say over actual fact finding.

Juries take their charge seriously, and strive to apply the law honestly and fairly to the facts of the case before them, infusing practical knowledge of ordinary life and the expectations of ordinary people into the administration of justice. In the federal courts, of course, all judges are lawyers. A judge can thus draw only on that rather more narrow and unrepresentative life experience in determining what is "fair" or "reasonable," whereas juries can draw on the varied experiences of several people from different walks of life. This multitude of perspectives is much more apt to produce a just result in most cases. Therefore, to the extent that a judge decides an ERISA case differently than would a jury from the community, he may well be producing a factually erroneous result, likely to the detriment both of individual claimants particularly and of the integrity of the private disability insurance system generally.

The Court's observations about disability benefits plans and the legal regime governing them lead to two conclusions. First, administrators and fiduciaries have important public responsibilities. While they have a duty to shareholders to seek profit, they must do so with an awareness of the essential function that they perform in society, and of the comparatively limited oversight they receive from public institutions. They must avoid the temptation to improve their bottom line by denying valid claims. Second, the courts must decide these cases with an awareness of the social policies at stake, the failures in the particular market in question, and the possibility that judges, who lack the ordinary life experience of juries, may systematically err in their evaluations of what is reasonable and fair. With this background understanding in mind, the Court turns to the merits.

### D. Doe's Release of Claims against Hawkins Does Not Apply to Claims against First Unum

First Unum belatedly filed a Supplemental Motion for Summary Judgment [Doc. No. 30], which it provided to the Court and to Radford at the November 3, 2003 summary judgment hearing. First Unum explained that Doe had entered into an Agreement and General Release with Hawkins, in which he released Hawkins and its agents from future claims, and then argued that First Unum, as an agent of Hawkins, was released as well. *See* Def.'s Supp. Mot. & Mem. at 1.

■ Because First Unum failed to raise this defense in its Answer, *see* Answer [Doc. No. 3], it could not raise it at the summary judgment stage. Release is an affirmative defense, enumerated under Federal Rule of Civil Procedure 8(c), and in general, failure to raise an affirmative defense in the original pleadings constitutes a waiver of the defense. *See* Fed. R.Civ.P. 8(c); *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1226 (1st Cir.1994); *Federal Deposit Ins. Corp. v. Ramirez–Rivera*, 869 F.2d 624, 626 (1st Cir.1989). None of the exceptions to this general rule applied here. For example, although the First Circuit excuses noncompliance with Rule 8(c) where a defense "has been fully tried under the express or implied consent of the parties, as if it had been raised in the original responsive pleading," *Ramirez–Rivera*, 869 F.2d at 626–27, here Radford had insufficient opportunity to "try" the issue at the November 3, 2003 summary judgment hearing, and explicitly objected to First Unum's belated raising of the defense. *See* Pl.'s Opp'n to Def.'s Supp. Mot. [Doc. No. 31] at 2. Similarly, "when there is no prejudice and when fairness dictates, the strictures of [Rule 8(c)] may be relaxed," *Jakobsen v. Massachusetts Port Auth.*, 520 F.2d 810,

813 (1st Cir.1975),[15] but here Radford did not receive adequate notice, and was also prejudiced insofar as it had insufficient opportunity to do any necessary factual investigation or to address the defense in oral argument.

In any case, First Unum's argument was utterly without merit. It is hornbook law that "the distinction between the servant or agent relationship and that of independent contractor turn[s] on the absence of authority in the principal to control the physical conduct of the contractor in performance of the contract." *Logue v. United States*, 412 U.S. 521, 527, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973); *see also* Restatement (Second) of Agency § 1 & cmt. b (1958). Hawkins had no power to control First Unum's actions in administering the Plan, so First Unum was not Hawkins's agent.

Like any litigant, First Unum is of course free to defend its conduct with good faith arguments when its actions are challenged in court. This right does not, however, extend to the advancement of frivo-

lous arguments that can only result in added expense and delay, and such conduct is particularly inconsistent with an ERISA plan administrator's or fiduciary's public responsibilities.

### E. Doe's Coverage under the Policy [16]

#### 1. Application of the *Contra Proferentum* Rule

At the outset, the Court notes that the *contra proferentum* rule requires that ambiguous terms in the Policy be construed against First Unum. Although First Unum claimed at oral argument that the rule does not apply to ERISA-governed plans, the First Circuit has explicitly held otherwise, at least in cases where the plan does not vest the administrator or fiduciary with discretionary authority. *See Hughes*, 26 F.3d at 268.[17] The Court merely notes the *contra proferentum* rule's applicability for the sake of completeness, however, because nothing in the Court's analysis or holdings would change if the rule did not apply.

---

**15.** Some courts relax the strictures of Rule 8(c) under these circumstances, but the First Circuit has yet to decide whether to adopt this approach. *Knapp Shoes*, 15 F.3d at 1226.

**16.** Doe has not argued that First Unum waived any defenses to coverage based on failure to consider an element of his claim, so the Court need not address the availability of any waiver argument. *See Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375, 381–82 (2d Cir.2002) (holding that waiver can sometimes apply in ERISA cases); *Pitts v. American Sec. Life Ins. Co.*, 931 F.2d 351, 357 (5th Cir.1991) (similar); *Russo v. Abington Mem'l Hosp.*, No. Civ. A. 94–195, 2002 WL 1906963, at *12 (E.D.Pa. Aug.1, 2002) (similar). *But see White v. Provident Life & Accident Ins. Co.*, 114 F.3d 26, 29 (4th Cir.1997).

**17.** Dicta in a later First Circuit decision could be read to suggest that *Hughes* only applied the *contra proferentum* rule because the summary judgment standard required the *Hughes*

court to view the facts favorably to the plaintiff. *See Golden Rule*, 45 F.3d at 517 n. 6. That would at best be a strained reading of *Hughes*, however, and the *Golden Rule* court's language is better understood as merely noting that *Hughes* was in a summary judgment posture. *Hughes* nowhere suggests that *contra proferentum* only applies in the summary judgment context; rather, it describes the rule as one that applies generally. *See Hughes*, 26 F.3d at 268. Even if *Golden Rule* is read to express a desire on the First Circuit's part to overrule *Hughes*, " 'the law of the circuit doctrine' ... holds a prior panel decision inviolate absent either the occurrence of a controlling intervening event (e.g., a Supreme Court opinion on the point; a ruling of the circuit, sitting en banc; or a statutory overruling) or, in extremely rare circumstances, where non-controlling but persuasive case law suggests such a course." *United States v. Chhien*, 266 F.3d 1, 11 (1st Cir.2001) (noting that newly constituted panels in the First Circuit must adhere to decisions of prior panels).

### 2. Doe's Eligibility for Benefits under the Policy

Under the Policy, "disability" and "disabled" were defined to mean that "the insured cannot perform each of the material duties of his regular occupation." R. at FULCL00677. Under a separate provision governing payment of benefits: "When [First Unum] receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, [First Unum] will pay the insured a monthly benefit after the end of the elimination period." *Id.* at FULCL00675. Coverage terminated, *inter alia,* when active employment ended or when the insured ceased to be a member of an insured class, except that if an employee became disabled before one of those things happened, coverage extended through the elimination period and for as long as benefits were paid under the Policy. *Id.* at FULCL00669.

From the date of First Unum's initial denial of benefits, the company consistently maintained that these provisions, read together, meant that Doe's failure to submit proof that he had seen a physician before his active employment ended meant that he was ineligible for benefits. *See, e.g.,* Def.'s 56.1 Stmt. ¶ 67. In other words, First Unum maintained that an insured was not "disabled" under the Policy until he submitted proof of regular attendance of a physician, so failure to submit such proof before being fired meant that coverage terminated before the insured became disabled. This was also the primary position it maintained in filings with the Court. *See* Def.'s Opp'n at 5–9; Def.'s Mot. for Summ. J. & Mem. [Doc. No. 13] at 14–15. At the November 3, 2003 summary judgment hearing, the Court pressed First Unum on this point, noting that under the company's interpretation, it could easily happen that an employee could be fired for disability before ever having a chance to see a doctor. 11/03/03 Hr'g Tr. First Unum revised its position then, suggesting that the company would be required to pay benefits if proof of attendance by a physician were provided within a "reasonable" period of time after termination. *Id.* First Unum had also offered this as an alternative reading in its papers, suggesting that even if its interpretation of the Policy were incorrect, it had been justified in treating as probative the fact that Doe "sought absolutely no medical attention for his condition until months after he actually stopped working." Def.'s Opp'n at 7.

The record made plain that the interpretation First Unum proffered at the hearing and as an alternative argument in its filings was not the one it applied to Doe's claim. First Unum's original denial of benefits stated that Doe was "not under care of a physician" between April 21, 1999 and June 22, 1999 (the date when he visited Dr. Singh), and thus that "[i]mpairments [were] not supported" for that time period. *Id.* ¶ 50 (quoting R. at FULCL00229) (alteration in original). Thus, in First Unum's view, Doe could not prove disability before the date of his first visit to a physician. If First Unum had merely been treating attendance of a physician as probative of disability, rather than as a prerequisite for finding disability, then it at least would have considered the possibility that Doe was "disabled" as of the date he made his appointment with Dr. Singh, or as of some earlier date. First Unum did not consider that possibility, nor did it even consider Dr. Singh's evaluation of when Doe's schizophrenia began to become more acute; all that mattered was the date on which she made her diagnosis.

First Unum's interpretation defied the Policy's plain language. Regular attend-

ance of a physician was in no way built into the definition of "disability" or "disabled." Even the provision relating to proof that regular attendance of a physician was required distinguished between that requirement and proof of disability; it stated that First Unum would provide benefits when it "receives proof that an insured is disabled ... *and* requires the regular attendance of a physician." R. at FULCL00675 (emphasis added). It is worth noting that the provision did not even require proof that a physician visit had occurred, but simply a demonstration that the condition was severe enough to "require" such visits. Obviously, a doctor's diagnosis of schizophrenia would be highly probative that disability began at least on the date of diagnosis, but there was nothing in the Policy to suggest that it was impossible to prove disability before the date of diagnosis, or that unless a visit to a physician occurred before active employment terminated, an employee was ineligible for benefits.

The Policy also stated that "[t]he benefit will be paid for the period of disability if the insured gives to the Company proof of continued: 1. disability; and 2. regular attendance of a physician." R. at FULCL00675. The obvious meaning of this provision was that once a claimant had established disability and eligibility for receipt of benefits, to continue to receive benefits she had to continue to see a doctor and to submit proof of her visits to the Company, in order to show that she remained eligible. First Unum could not rely on this provision to argue that failure to visit a doctor before active employment ended rendered an employee ineligible for benefits.

First Unum's approach was not even coherent. The company alternated between separating and conflating the provisions governing eligibility for benefits and the administrative requirements for receipt of benefits. First Unum did not interpret the provision mandating proof of a disability requiring regular attendance of a physician to mean that if proof were submitted after employment ceased, there would be no coverage. As long as the proof submitted showed that disability began while the claimant was employed, the claimant could receive benefits. In this regard, First Unum was treating the eligibility and receipt provisions as separate. Then, however, First Unum imported the idea of regular attendance of a physician into the definition of "disabled," thus conflating the two provisions.

Moreover, as the Court suggested at oral argument, First Unum's interpretation would lead to obviously absurd results. Coverage under the Policy terminated when active employment ceased. It is not uncommon for a disability to lead to the cessation of active employment, and unfortunately, it is far from unheard of for a company, in good faith or otherwise, to fire an employee when he becomes disabled. The availability of benefits under the Policy cannot turn on the accident of whether the insured was fortunate enough to get to see a doctor before employment terminated. In many cases, even if an insured sought a doctor's appointment immediately upon becoming disabled, there is no guarantee that the doctor could schedule him promptly. Moreover, given that employment termination is more likely to occur swiftly after the onset of a major disability than after the onset of a minor one, First Unum's interpretation would make the most severely disabled the least likely to receive coverage. These are precisely the people whom the Policy was most designed to protect, and often their impairments are the easiest to verify.

The more reasonable interpretation closely resembled the one that Radford

proposed. *See* Pl.'s Mem. Opp'n at 7–8. To qualify for coverage, an insured had to have become "disabled" in some objectively verifiable way before the date that coverage terminated. A claimant had to submit proof of that disability and that regular attendance of a physician was required in order to begin receiving benefits, and periodically had to submit proof of continuing attendance by a physician to continue receiving benefits. Proof of actual attendance by a physician was a prerequisite for continuing receipt of benefits once a claimant qualified, not for establishing the date when disability began.[18]

After interpreting the Policy's terms, the Court then had to determine when Doe became "disabled," as the Policy defines that term. It was clear from the record that Doe became disabled before his active employment ceased, and that he was therefore entitled to receive benefits under the Policy (assuming he complied with relevant requirements).

More specifically, the record showed that Hawkins fired Doe because his schizophrenia had rendered him unable to "perform each of the material duties of his regular occupation," so Doe was necessarily "disabled" before Hawkins made its decision to terminate him, and that decision was made no later than April 26, 1999. Doe consistently maintained that April 20, 1999 was the day on which his schizophrenia became sufficiently acute that he could not perform his job, and this was consistent with the termination that followed only days later. As has already been stated, the Court found that Doe was actively employed until May 21, 1999, and that Hawkins's April 26, 1999 decision to terminate Doe's employment was based on increasing manifestations of Doe's schizo-

phrenia. First Unum itself conceded that Doe's active employment did not end before April 26, 1999. *See, e.g.,* Def.'s Mot. for Summ. J. & Mem. at 12–13.

There could be little doubt that as of April 20, 1999, Doe was unable to perform the "material duties of his regular occupation." Of the "material duties" of a lawyer's "regular occupation," this Court could not imagine a single one that does not require some combination of ability to handle the required workload, attention, concentration, and social interaction. Research, writing, and the other analytical tasks that any lawyer performs involve the first three, and consultation with clients and colleagues involves the last three. Public finance lawyers are no different from other members of the bar in these respects. First Unum conceded that "[Doe] was terminated due to inability to handle the workload, poor attention, poor concentration and diminished social interactions," Pl.'s 56.1 Stmt. ¶ 120 (quoting R. at FULCL00231) (internal quotation marks omitted); Def.'s Resp. ¶ 120, and the record demonstrates that these failures resulted from Doe's increasingly acute schizophrenia. Thus, Hawkins decided that Doe no longer possessed the qualities that were necessary for him to perform the material aspects of his job.

First Unum tried to trap Doe in a Catch–22, arguing that because Doe maintained that he continued to work full time through at least May 21, 1999, he could not have been "disabled" during that period. Def.'s Opp'n at 3–4. This was pure sophistry. Of course, if First Unum had accepted the premise that Doe worked full time until May 21, 1999, it would have had to accept that he remained eligible under the

18. Again, this interpretation was based on the Policy's plain language. Even if there had been any ambiguity in the Policy's meaning, the *contra proferentum* rule would have required adoption of the Court's interpretation.

Policy until that date, and it would then have had to argue that Doe's schizophrenia suddenly appeared between that date and June 22, 1999, when Doe visited Dr. Singh. More to the point, First Unum conflated the definitions of "disability" and "active employment." "Active employment" merely required that the employee work full-time at regular pay, or at least thirty hours per week at Hawkins's office or any place Hawkins required an employee to travel. The definition in no way required that work done during this time be satisfactory, or that the employee be productive. "Disability," on the other hand, related to the quality of an employee's work. Presumably, a "material duty" included a requirement that the relevant tasks be performed satisfactorily. Thus, if Doe spent a full forty-hour week producing a research memorandum that the average associate would be expected to finish in ten hours, he would be "actively employed," even though he could not perform that material duty. If the speed and quality of Doe's work in all material areas were low enough, he would be "disabled," even if he were "actively employed."

Under First Unum's argument, a schizophrenic employee could not become "disabled" until the moment he stopped working. Of course, if he had not yet seen a doctor regarding his condition, First Unum believed that he would become forever ineligible for benefits the moment he stopped working. This could not possibly be the correct interpretation of the Policy.

■ Thus, the evidence in the record showed that Doe became "disabled" under the terms of the Policy as of April 20, 1999 (certainly no later than April 26, 1999), and that he ceased active employment on May 21, 1999 (certainly no earlier than April 26, 1999). The nexus between the end of Doe's employment and the onset of "disability," as defined under the Policy, was such that no reasonable interpretation of the record could place Doe's date of disability after the date his active employment ended.

First Unum's conduct in denying Doe's claim was entirely inconsistent with the company's public responsibilities and with its obligations under the Policy. This is not the first time that First Unum has sought to avoid its contractual responsibilities, and an examination of cases involving First Unum and Unum Life Insurance Company of America, which like First Unum is an insuring subsidiary of Unum Provident Corporation,[19] reveals a disturbing pattern of erroneous and arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous tactics.[20] These cases suggest that segments

19. *UnumProvident Companies*, at http://www.unum.com/aboutus/ourcompanies/upbrandedcompanies.aspx (last visited June 10, 2004). Other subsidiaries include Provident Life and Accident Insurance Company, The Paul Revere Life Insurance Company, and Provident Life and Casualty Insurance Company. *Id.*

20. Courts have often commented unfavorably on these companies' conduct. *See, e.g., Hedley–Whyte v. Unum Life Ins. Co. of America,* No. Civ. A. 94–11731–GAO, 1996 WL 208492, at *3 (D.Mass. Mar.6, 1996) (O'Toole, J.) (noting that attorney's fees were particularly appropriate because Unum Life's construction of its policy was so clearly at odds with its plain language); *Keller v. Unum Life Ins. Co. of America,* No. 90 Civ. 5718(VLB), 1992 WL 346343, at *2 (S.D.N.Y. Sept.30, 1992) (describing Unum's behavior as "culpably abusive").

Numerous courts have reversed these companies' denials of benefits under a *de novo* standard, many times criticizing their practices. *See Lauder v. First Unum Life Ins. Co.,* Nos. 02–9152, 02–9232, 76 Fed.Appx. 348, 350, 2003 WL 21910757, at *2 (2d Cir. Aug.8, 2003) (unpublished opinion) ("There was ample demonstration of bad faith on First Unum's part, including … the frivolous nature of virtually every position it has advocat-

that have run in recent years on "60 Min-utes" and "Dateline," alleging that Unum

ed in the litigation."); *Curtin v. Unum Life Ins. Co. of America,* 298 F.Supp.2d 149, 159 (D.Me.2004) ("[T]his Court finds that Defendants exhibited a low level of care to avoid improper denial of claims at great human expense."); *Locher v. UNUM Life Ins. Co. of America,* No. 96 Civ. 3828(LTS)(HPB), 2002 WL 362769, at *9–10 (S.D.N.Y. Mar. 7, 2002) (overturning Unum's denial of benefits, despite Unum's argument that the claimant was not disabled because she worked a full day the day she left her job); *Barone v. UNUM Life Ins. Co. of America,* 186 F.Supp.2d 777, 787 (E.D.Mich.2002); *Wilkes v. UNUM Life Ins. Co. of America,* No. 01–C–182–C, 2002 WL 926279, at *10 (W.D.Wis. Jan.29, 2002) (finding "that the defendant's position was not substantially justified or taken in good faith"); *Hall v. Unum Life Ins. Co. of America,* No. 97–CV–1828, 1999 WL 33485551, at *8 (D.Colo. Nov.1, 1999) *vacated in part on other grounds,* 300 F.3d 1197 (10th Cir.2002); *Leva v. First Unum Ins. Co.,* No. 96 CIV 8590(DC), 1999 WL 294802, at *1–2 (S.D.N.Y. May 11, 1999) (noting that "Unum is 'culpable' in the sense that it did not consider [the plaintiff's] application with the care that she deserved," and that the only medical review of the claim was done by a registered nurse, who happened to be the claims examiner's mother); *Jones v. UNUM Life Ins. Co. of America,* No. 95–5808, 1998 WL 778366, at *6 (S.D.N.Y. Nov. 6, 1998), *vacated in part on other grounds,* 223 F.3d 130 (2d Cir.2000); *Ragsdale v. Unum Life Ins. Co. of America,* 999 F.Supp. 1016, 1026 (N.D.Ohio 1998); *Dishman v. UNUM Life Ins. Co. of America,* No. 96–0015–JSL, 1997 WL 906146, at *11–13 (C.D.Cal. May 9, 1997) (noting that the court would have reached the same decision under an arbitrary and capricious standard, and describing Unum Life's "unscrupulous conduct" in engaging in "bad faith denial of large claims as a strategy for settling them for substantially less than the amount owed"); *Hamner v. Unum Life Ins. Co. of America,* No. C 96–1973 TEH, 1997 WL 257515, at *6 (N.D.Cal. May 6, 1997); *Mays v. Unum Life Ins. Co. of America,* No. 95 C 1168, 1995 WL 631807, at *9 (N.D.Ill. Oct.24, 1995).

Similar comment on the companies' practices can be found in decisions reversing denials of benefits under an arbitrary and capricious or abuse of discretion standard. *See Morgan v. UNUM Life Ins. Co. of America,* 346 F.3d 1173, 1178 (8th Cir.2003); *Lain v. UNUM Life Ins. Co. of America,* 279 F.3d 337, 346–47 (5th Cir.2002) (basing the decision in part on Unum's misinterpretation of its own policy); *Shutts v. First Unum Life Ins. Co.,* No. 1:01–cv–1993, 2004 WL 615134, at *7–8 (N.D.N.Y. Mar.24, 2004); *Crespo v. Unum Life Ins. Co. of America,* 294 F.Supp.2d 980, 994, 996–97 (N.D.Ill.2003) (reversing in part because Unum based its denial on failure to prove "disability" before or near the last day of work); *Mennenoh v. Unum Life Ins. Co. of America,* 302 F.Supp.2d 982, 989–90 (W.D.Wis.2003); *Cheng v. Unum Life Ins. Co. of America,* 291 F.Supp.2d 717, 721 (N.D.Ill. 2003); *Pelchat v. UNUM Life Ins. Co. of America,* No. 3:02CV7282, 2003 WL 21479170, at *3 (N.D.Ohio June 25, 2003) ("UNUM's decision was therefore not based on a good faith interpretation of its policy language or an honest mistake."); *Dirnberger v. Unum Life Ins. Co. of America,* 246 F.Supp.2d 927, 935 (W.D.Tenn.2002); *Henar v. First Unum Life Ins. Co.,* No. 02 Civ. 1570(LBS), 2002 WL 31098495, at *5 (S.D.N.Y. Sept.19, 2002); *Holzschuh v. UNUM Life Ins. Co. of America,* No. Civ. A. 02–1035, 2002 WL 1609983, at *9 (E.D.Pa. July 18, 2002); *Winters v. UNUM Life Ins. Co. of America,* 232 F.Supp.2d 918, 932–33 (W.D.Wis.2002); *Heffernan v. UNUM Life Ins. Co. of America,* No. C–1–97–545, 2001 WL 1842465, at *6 (S.D.Ohio Mar.21, 2001); *Newman v. UNUM Life Ins. Co. of America,* No. 99 C 7420, 2000 WL 1593443, at *6–7 (N.D.Ill. Oct.23, 2000) (finding, in a case where Unum maintained a policy interpretation similar to First Unum's interpretation of the Policy in this case, that the "defendant contorted the meaning of its own policy in order to deny plaintiff's claim on a nonexistent technicality"); *Hines v. Unum Life Ins. Co. of America,* 110 F.Supp.2d 458, 460–61 (W.D.Va.2000) (noting the "scathing failure by Unum Insurance to impartially administer the disability plan"); *Lake v. UNUM Life Ins. Co. of America,* 50 F.Supp.2d 1243, 1257 (M.D.Ala.1999); *Russell v. UNUM Life Ins. Co. of America,* 40 F.Supp.2d 747, 751 (D.S.C. 1999); *Riley v. Unum Life Ins. Co. of America,* 28 F.Supp.2d 639, 643–44 (D.Kan.1998); *see also Dandurand v. Unum Life Ins. Co. of America,* 284 F.3d 331, 336–38 (1st Cir.2002) (overturning an arbitrary and capricious calculation of benefits); *Wyatt v. Unum Life Ins. Co. of America,* No. 97 C 8228, 1999 WL 116213, at *7 (N.D.Ill. Mar.2, 1999) (overturning a decision to offset a claimant's benefits because of an alleged eligibility for benefits from the Federal Insurance Company).

Provident "regularly declines disability claims as a way of boosting profits," may have been accurate. *See* Edward D. Murphy, *Unum Corp. Retirees Feeling a "Sense of Loss,"* Portland Press Herald, Apr. 29, 2003, at 1C. This Court cannot tell whether First Unum and other Unum Provident companies are considered pariahs in the industry, or whether their ability to retain customers is a result of low prices, market inefficiency, or other factors. In either case, employers have a duty to select insurers for their employees with care, and to avoid hiring insurers with reputations for shoddy and hostile claims administration, although it may well be that suits based on violation of this duty are preempted under ERISA.

### F. Other Grounds for Denying Doe's Claim

Beyond what the Court has discussed here, First Unum failed to preserve any other argument for denying Doe's claim. While evaluating Doe's claim and subsequent appeals, First Unum relied exclusively on its assertion that Doe had not become disabled before his coverage terminated. In proceedings before this Court, First Unum did not argue any grounds for its position other than those which the Court has discussed. Thus, any alternative arguments have been waived. *See* Fed.R.Civ.P. 8(c); *Knapp Shoes,* 15 F.3d at 1226; *Ramirez–Rivera,* 869 F.2d at 626.

### G. Remand Would Be Inappropriate

First Unum argued that to the extent that the Court decided that the company had erred in denying Doe's benefits claim, the appropriate course would be to remand to First Unum for a determination whether Doe's disability had rendered him unable to "perform each of the material duties of his regular occupation," and whether, if eligible for benefits at the end of the Elimination Period, he had remained eligible during the months thereafter. Def.'s Opp'n at 18 n. 5. First Unum never reached the former issue, because it determined that when Doe's alleged disability commenced, he was no longer in an eligible class of employees because his active employment had terminated. *See id.* Doe considered remand inappropriate. Pl.'s Supp. Resp. [Doc. No. 26] at 8–9.

According to the First Circuit, "[o]nce a court finds that an administrator has acted arbitrarily and capriciously in denying a claim for benefits, the court can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *Cook v. Liberty Life Assurance Co.,* 320 F.3d 11, 24 (1st Cir.2003). There is no reason to believe that district courts should be more reluctant retroactively to award benefits in cases of *de novo* review than in cases that involve arbitrary and capricious review. If anything, the opposite should be true; the less discretion a non-judicial decisionmaker has in reaching a decision, the less intrusive it is for a reviewing court to award relief to a claimant directly. A useful analogy can be found in mandamus, which most commonly lies to compel performance of "a clear nondiscretionary duty." *See, e.g., Heckler v. Ringer,* 466 U.S. 602, 616, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) (exemplifying this more "orthodox" view). Although the appropriate use of mandamus is contested, *see* 4 Kenneth C. Davis, *Administrative Law Treatise* § 23.12 at 169, § 23.7 at 155 (1983) (discussing the "orthodox" view of mandamus and the broader view that some Supreme Court cases have taken), there can be little doubt that the less discretion the official in question has, the more appropriate is mandamus relief.

■ *Cook* also makes clear that district courts have remedial discretion regardless of whether the case involves denial or termination of benefits. The First Circuit laid out the relevant principles through quotations from cases in other circuits, although it "acknowledge[d] that several of these quotations may overstate the matter": "[R]etroactive reinstatement of benefits is appropriate in ERISA cases where, as here, but for [the insurer's] arbitrary and capricious conduct, [the insured] would have continued to receive the benefits or where there [was] no evidence in the record to support a termination or denial of benefits." 320 F.3d at 24 (alterations in original) (quoting *Grosz–Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir.2001) (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 477 (7th Cir.1998))) (internal quotation marks omitted). Moreover, "a remand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable." *Zervos v. Verizon N.Y., Inc.*, 277 F.3d 635, 648 (2d Cir. 2002) (internal quotation marks omitted) (quoted with approval in *Cook*, 320 F.3d at 24). "We do not agree, however, that a remand to the plan administrator is appropriate in every case." *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1330 (11th Cir.2001) (quoted with approval in *Cook*, 320 F.3d at 24). Finally, "a plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts." *Grosz–Salomon*, 237 F.3d at 1163 (quoted with approval in *Cook*, 320 F.3d at 24).

The *Cook* court emphasized the "considerable discretion" that district courts have, even if "in some situations a district court, after finding a mistake in the denial of benefits, could conclude that the question of entitlement to benefits for a past period

should be subject to further proceedings before the ERISA plan administrator." 320 F.3d at 24. It suggested that remand is less appropriate where a denial was particularly flagrant or where it is likely that once the plan administrator corrects the errors in its decision, the proper result will be again to deny benefits for some or all of the relevant period. *Id.*

■ In this case, First Unum's denial was flagrant. The company adopted a patently unreasonable interpretation of the Policy and reached a decision that was plainly contrary to the facts in the record before it. First Unum's conduct also resulted in years of delay in distribution of Doe's benefits, and it is by no means clear that First Unum can be trusted fairly to adjudicate Doe's claim on remand. Even if the Court could trust First Unum, and even if the company had acted in good faith, further delay would merely have added to the injustice that Doe has already suffered.

The specific facts and holding of *Cook* provided further guidance to the Court. In that case, a plan administrator had terminated benefits for a claimant who allegedly suffered from chronic fatigue syndrome. *See Cook*, 320 F.3d at 13. In affirming the district court's decision both to reverse the administrator's decision and to retroactively award benefits, despite the fact that the claimant had provided no evidence of disability in the period following the termination, the First Circuit emphasized the unfairness of requiring the claimant to gather such information "on the off chance that she might prevail in her lawsuit." *Id.* at 25. The First Circuit also approved of the district judge's reasoning that the hardships created by wrongful termination of a claimant's benefits might make reconstruction of evidence

of disability during the relevant period difficult. *Id.*

As with chronic fatigue syndrome, mental illness and its impact on capacity to work typically present more difficult proof problems than physical injuries. Had First Unum acted responsibly in the first instance, it could have further investigated the impact of Doe's schizophrenia on his ability to perform his duties while the evidence was more easily obtainable, and upon determining that Doe was eligible to receive benefits, First Unum would have received continuing proof of disability and regular attendance of a physician. Were the Court to remand to First Unum now, when the original events are five years distant, Doe would face possibly insurmountable difficulties of proof. First Unum should not be given the opportunity to profit from its wrongdoing, and Doe should not have to do without needed benefits any longer. Even if First Unum had acted reasonably and in good faith, the long delay and difficulties of proof would favor retroactive reinstatement, rather than remand.

The Court therefore held that Doe was entitled to receive benefits under the Policy as of October 17, 1999, and for the twenty-four months thereafter, and that Radford was entitled to collect on Doe's behalf. October 17, 1999 was 180 days (the length of the Policy's Elimination Period) after April 20, 1999, the date this Court fixed for the beginning of Doe's disability. Twenty-four months was the maximum period for receipt of benefits for disability due to a "mental illness," with certain exceptions relating to confinement in a hospital or institution after that period. To the extent that Doe might have considered his schizophrenia a physical disability rather than a mental illness, or to the extent that he might have had claims for confinement after the twenty-four months, neither issue had been presented to First Unum, and no record was before the Court. Even in cases where an administrator or fiduciary has violated its obligations as flagrantly as has First Unum, there are limits on a district court's remedial discretion, and reaching those questions in this case would have exceeded the bounds of that discretion. *See Jones v. UNUM Life Ins. Co. of America,* 223 F.3d 130, 140–41 (2d Cir.2000).

The Court further held that for purposes of paying Doe's benefits, First Unum had to treat Doe as having been continually disabled between that date and the current date, and as having complied with any requirements under the Policy for continued receipt of benefits. To the extent that Doe remained qualified for continuing receipt of disability benefits after March 31, 2004 (the date of the Court's Order and Judgment), the Court held that he had to comply with such requirements as the Policy imposed to receive benefits from that date forward. This was the same approach that the *Cook* court took. 320 F.3d at 24–25.

Similarly, although any decision whether Doe's disability was a "mental" or a "physical" one was for First Unum to make in the first instance, the Court held that should First Unum or any court or other entity with the power to pass on such matters determine that Doe's disability is a "physical" one, entitling him to receive benefits for the length of his disability, he would have to be treated as if that determination had been made before his eligibility for receipt of benefits for "mental" disability expired. This was simply a logical extension of the Court's presumption that Doe was disabled from April 20, 1999 until March 31, 2004. Had First Unum acted responsibly, it could have determined how to characterize Doe's disability during the twenty-four months of cover-

age. Had First Unum decided the disability was "physical," benefits would have continued without a break, and had First Unum decided it was "mental," Doe would have had an opportunity promptly to appeal and, if he prevailed, to receive benefits with little or no interruption.

## H. Prejudgment Interest

Prejudgment interest is available but not obligatory in ERISA cases. *See Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 100 F.3d 220, 223 (1st Cir.1996) (citing *Quesinberry v. Life Insurance Co. of North America*, 987 F.2d 1017, 1030 (4th Cir.1993) (en banc)). District courts have considerable discretion in determining whether to award interest, as well as in determining the appropriate period and rate. *Cottrill*, 100 F.3d at 223. In exercising that discretion, courts should consider the general purposes of prejudgment interest, as well as ERISA's twin goals of making claimants whole and preventing unjust enrichment by administrators or fiduciaries who wrongfully withhold benefits. *See id.* at 224; *see also West Virginia v. United States*, 479 U.S. 305, 310 n. 2, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987) ("Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation . . . ."). It is important to note that the First Circuit nowhere suggests that courts should consider a party's bad faith in making the decision on prejudgment interest; the concern is with making the aggrieved party whole and with preventing unjust enrichment. *See Cottrill*, 100 F.3d at 223.

### 1. Availability

■ The Court held that Radford was entitled to prejudgment interest. This Court has noted on an earlier occasion that district courts rarely have discretion altogether to deny prejudgment interest to a prevailing party, because "by the time ERISA was enacted in 1974, the federal common law had recognized for over forty years that prejudgment interest is necessary to make a plaintiff whole." *Laurenzano v. Blue Cross & Blue Shield of Mass., Inc. Ret. Income Trust*, 191 F.Supp.2d 223, 234 (D.Mass.2002) (citing *Kansas v. Colorado*, 533 U.S. 1, 10, 121 S.Ct. 2023, 150 L.Ed.2d 72 (2001)). In this case, there are no special circumstances to justify denial of prejudgment interest, and the long delay in Doe's receipt of benefits strongly favors awarding interest.

### 2. Date of Accrual

■ As for accrual, the Court further held that prejudgment interest should run from October 17, 1999, the date on which Doe became eligible for benefits.[21] This decision requires some explanation, because "[o]rdinarily, a cause of action under ERISA and prejudgment interest on a plan participant's claim both accrue when a fiduciary denies a participant benefits." *Cottrill*, 100 F.3d at 223. Doe's claim for benefits was not denied until November 6, 2000. Def.'s 56.1 Stmt. ¶¶ 63–64.

When the First Circuit states that prejudgment interest "ordinarily" accrues from the date when the administrator or fiduciary denies a claim for benefits, it necessarily implies that there are exceptions to the rule. In deciding when such an exception is justified, a court must consider the purposes of prejudgment inter-

---

**21.** As is discussed below, the Court will amend its judgment so that prejudgment interest should run from June 13, 2000. This change does not fundamentally alter the analysis.

est: making the claimant whole and preventing unjust enrichment.

The Court first looked to Doe's entitlements under the Policy. The Policy stated that "[w]hen [First Unum] receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, [First Unum] will pay the insured a monthly benefit after the end of the elimination period." R. at FULCL00675. Thus, assuming that the elimination period has passed, a claimant becomes entitled to receive benefits when First Unum receives the required proof, not when First Unum decides that the submitted proof is adequate. Under the plain language of the Policy, had First Unum decided on November 6, 2000 to award Doe benefits, that determination would have meant that he was entitled to benefits as of the end of the elimination period or the date when First Unum received sufficient proof that he was disabled and required the regular attendance of a physician, whichever was later. The Court found that the information that First Unum received in Doe's initial claim application was sufficient to support such a determination, and thus held that Doe was entitled to receipt of benefits as of October 17, 1999.

Upon closer examination of the record, the Court has found information to which neither party pointed, showing that Doe did not submit an Employer's Statement and Job Analysis until June 13, 2000. *See* R. at FULCL00015–22. The information therein was important and arguably necessary for First Unum to reach a decision on Doe's benefits, so the Court revises its earlier finding and holding to reflect that Doe was eligible for benefits as of June 13, 2000. This change of date does not, however, change the analysis.

If Doe was entitled to receipt of benefits as of June 13, 2000, it stands to reason

that he was entitled to interest if he did not receive payment before then. "Every one who contracts to pay money on a certain day knows that, if he fails to fulfill his contract, he must pay the established rate of interest as damages for his nonperformance. Hence it may correctly be said that such is the implied contract of the parties." *Spalding v. Mason,* 161 U.S. 375, 396, 16 S.Ct. 592, 40 L.Ed. 738 (1896) (citation and internal quotation marks omitted). If benefits are dispensed some time after they are due, the beneficiary has not received the full value of his entitlement under the plan.

Given that ERISA seeks to make claimants whole and to prevent unjust enrichment, it also makes sense that when an administrator's or fiduciary's breach of the plan leads to belated payment of benefits owed thereunder, equity requires payment of sufficient interest on those benefits to realize ERISA's twin goals. In *Fotta v. Trustees of the United Mine Workers, Health & Retirement Fund of 1974,* 165 F.3d 209 (3d Cir.1998), the Third Circuit relied on precisely this reasoning in holding that a claimant under an ERISA-governed benefits plan is entitled to interest "where benefits are delayed but paid without the beneficiary's having obtained a judgment," and can sue to recover such interest as an equitable remedy under 29 U.S.C. § 1132(a)(3)(B). *Id.* at 212–14. Although the Supreme Court has held that ERISA does not permit consequential damages, punitive damages, or other "extracontractual" forms of relief under 29 U.S.C. § 1109(a), it has expressly reserved the question whether extracontractual damages may be sought under Section 1132(a)(3)(B). *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 139 n. 5, 144, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). The First Circuit has held that extracontractual damages are not available under

Section 1132(a)(3)(B). *Drinkwater v. Metropolitan Life Ins. Co.*, 846 F.2d 821, 825 (1st Cir.1988). In any case, absent a contractual provision to the contrary, interest for delayed payment of benefits is not even "extracontractual." Interest for late payment has long been understood to be implied in a contractual obligation to pay money. *Spalding*, 161 U.S. at 396, 16 S.Ct. 592; *Fotta*, 165 F.3d at 213.

Other courts have followed *Fotta*. *See Dunnigan v. Metropolitan Life Ins. Co.*, 277 F.3d 223, 229 (2d Cir.2002); *Clair v. Harris Trust & Sav. Bank*, 190 F.3d 495, 497–99 (7th Cir.1999); *Anderson v. Business Men's Assurance Co.*, No. Civ. A. 02–2212, 2003 WL 21305335, at *4–5 (E.D.La. June 5, 2003). The Eighth Circuit has followed *Fotta* to the extent that it permits recovery of interest to prevent unjust enrichment. *See Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 945 (8th Cir.1999) (disagreeing with *Fotta* "[t]o the extent that [it] may be read to allow recovery of interest as extracontractual or consequential damages," rather than to prevent unjust enrichment).[22]

Paradoxically, although the recent case of *Great–West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), took a restrictive view of equitable relief in ERISA cases, it appears to support the *Fotta* line of cases.[23] The *Knudson* case involved an action for specific performance of the reimbursement provision of an ERISA plan, to compel a plan beneficiary who had recov-

ered from an alleged third-party tortfeasor to make restitution to the plan for benefits it had paid. *See id.* at 207–08, 122 S.Ct. 708. The Supreme Court held that the action would not lie under 29 U.S.C. § 1132(a)(3)(B), which authorizes plan beneficiaries and fiduciaries to bring actions for "appropriate equitable relief." *Knudson*, 534 U.S. at 221, 122 S.Ct. 708. Justice Scalia's majority opinion began by noting that courts have been "reluctant to tamper with [the] enforcement scheme embodied in [ERISA] by extending remedies not specifically authorized by its text." *Id.* at 209, 122 S.Ct. 708 (quoting *Russell*, 473 U.S. at 147, 105 S.Ct. 3085) (internal quotation marks omitted). Justice Scalia also reiterated that the term "equitable relief" in Section 1132(a)(3)(B) refers to "those categories of relief that were *typically* available in equity." *Id.* at 210, 122 S.Ct. 708 (quoting *Mertens v. Hewitt Associates*, 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)) (internal quotation marks omitted). He went on to explain that the remedy sought was in effect restitution, and that restitution was a legal remedy in an action at law, and an equitable remedy in an action in equity. *Id.* at 212–13, 122 S.Ct. 708. In cases like the one before the *Knudson* Court, where the "restitution" sought was essentially money damages for breach of a contract provision, the remedy was legal in nature and did not fall under Section 1132(a)(3)(B). *Id.* at 213–14, 122 S.Ct. 708. By contrast, in

---

**22.** The Eleventh Circuit has expressly reserved the question whether to follow *Fotta*. *See Flint v. ABB, Inc.*, 337 F.3d 1326, 1330–31 (11th Cir.2003). The court did suggest that the Supreme Court's decision in *Great–West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), may have undermined *Fotta*, insofar as it adopted a narrower interpretation of "appropriate equitable relief" than earlier court of appeals decisions had used. *See*

*Flint*, 337 F.3d at 1330–31. Respectfully, this Court disagrees.

**23.** The First Circuit has taken note of *Knudson*, but has not determined what effect the case has on prior case law governing the availability of particular kinds of relief under Section 1132(a)(3)(B). *Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 110 n. 8 (1st Cir.2002).

cases where the relief sought was in the nature of a constructive trust or an equitable lien, the remedy sought would be "restitution *in equity*," and would lie under Section 1132(a)(3)(B). *Id.*

The Court characterizes *Knudson* as supporting *Fotta*, because Justice Scalia's analysis of legal and equitable restitution mirrors and cites with approval the analysis in opinions by Judge Posner of the Seventh Circuit, and Judge Posner used precisely that analysis in the opinion where the Seventh Circuit decided to follow *Fotta. See Knudson*, 534 U.S. at 213, 122 S.Ct. 708 (quoting *Wal–Mart Stores, Inc. v. Wells*, 213 F.3d 398, 401 (7th Cir. 2000) (Posner, J.)); *id.* at 213, 122 S.Ct. 708 (quoting *Reich v. Continental Casualty Co.*, 33 F.3d 754, 756 (7th Cir.1994) (Posner, C.J.)); *Clair*, 190 F.3d at 497–99 (Posner, C.J.) (holding that a plan participant could bring the sort of action authorized in *Fotta* under Section 1132(a)(3)(B), because the remedy sought was in the nature of a constructive trust).

The courts that follow *Fotta* agree that a statutory violation or breach of the plan is a necessary condition for recovery of interest. *See, e.g., Jackson v. Fortis Benefits Ins. Co.*, 245 F.3d 748, 750 (8th Cir.2001) (holding that there must be "a showing that the plan was breached before interest on back payments may be awarded under ERISA"); *Clair*, 190 F.3d at 497–99 (similar); *Fotta*, 165 F.3d at 213 (similar). This does not mean that the plan administrator or fiduciary must have acted in bad faith, however. *Dunnigan*, 277 F.3d at 229–30. The question is whether the administrator or fiduciary paid out the benefits at some date after the claimant became entitled to them. *Id.* (citing *Clair*, 190 F.3d at 498–99, and *Fotta*, 165 F.3d at 213).

Although this Court follows *Fotta* fully, and the Eighth Circuit's approach to this issue is more restrictive than the Third Circuit's, *Jackson* is particularly instructive in this case. The plan at issue in *Jackson* was apparently similar to the Policy in this case: it required Fortis (who administered the plan) "to pay disability benefits upon receipt of 'proof that [the claimant] is totally disabled due to sickness or injury and requires the regular care of a physician.'" 245 F.3d 748 (alteration in original) (citation omitted).[24] The claimant in *Jackson* submitted her claim, which was initially denied, in January 1996, but only provided sufficient documentation to justify award of benefits in December 1998, during the appeal process. *Id.* at 749. The insurance company allowed her claim three weeks later, finding that she had established a disability date of July 5, 1995, and made a lump sum payment that did not include interest for the period between the disability onset date and the claim payment. *Id.*

The Eighth Circuit affirmed the district court's award of summary judgment to the insurer on grounds that there was no violation of ERISA or of the plan's terms. *Id.* at 750. It is clear from reading the *Jackson* opinion that the Eighth Circuit appropriately focused on the date of eligibility for benefits, not the date of disability or the date the claim was filed. Because the plan only entitled a recipient to benefits upon receipt of proof of disability, the claimant only became entitled to benefits in December 1998, the first date on which adequate proof was submitted. Fortis paid out a lump sum almost immediately after receiving such proof, so it could not

---

**24.** Similar to the Policy in this case, the plan in *Jackson* defined disability as "an injury or sickness which … prevents the insured from doing each of the main duties of his or her regular job." *Jackson*, 245 F.3d at 748.

be said that it had violated the plan's terms.

By contrast, in this case, Doe submitted sufficient proof on June 13, 2000, and became eligible for receipt of benefits on that date. Under the terms of the Policy, then, interest from that date would have been appropriate, particularly as the delay in receipt of benefits became significant. Had First Unum awarded Doe benefits on November 6, 2000, roughly five months later, despite having access to most of the relevant medical information for over a year, the delay would have been sufficient that payment of interest would be required, and Doe could seek such interest in an action for equitable relief under Section 1132(a)(3)(B).

Even if such an action were not available, that would not necessarily preclude prejudgment interest for the period between eligibility of benefits and the denial of benefits, as part of the relief in an action to overturn a denial of benefits. *See Senese v. Chicago Area I.B. of T. Pension Fund*, 237 F.3d 819, 825 (7th Cir.2001) (noting the "plausible argument" for a "distinction ... between an award of prejudgment interest on denied benefits and an independent action solely to recover interest on delayed benefits," and collecting cases). If, on the one hand, the refusal to permit such an action were grounded in the absence of an express provision in ERISA, it is clear that prejudgment interest, though not specifically authorized in the statute, is permissible. Thus, even if an independent cause of action falls too far afield of ERISA's express provisions, relief in the form of prejudgment interest is much less controversial. If, on the other hand, the refusal were grounded in a policy judgment that such actions would so multiply litigation as to intrude more into the administration of benefits plans than Congress wished, that concern is absent when courts are deciding what relief to award in cases that are legitimately before them.

 Thus, several factors suggest departing from the First Circuit's default rule that prejudgment interest runs from the denial of the claim. First, the terms of the Policy entitle claimants to benefits as of the date First Unum receives sufficient proof, not as of the date that First Unum passes on the adequacy of that proof. Second, First Unum's delay in reaching a decision would likely be sufficient to justify an independent action for interest during the period of delay. Third, Doe became eligible for benefits almost four years ago, so the profit from use of Doe's money during the five months between eligibility and denial has likely compounded substantially, such that fixing the date for prejudgment interest at the date of denial would result in First Unum receiving an unusually large amount of unjust enrichment. Moreover, the Court's departure is consistent with the First Circuit's rationale for the general rule: "making a participant whole for the period during which the fiduciary withholds money legally due." *Cottrill*, 100 F.3d at 223.

In considering what to do when departure from the ordinary rule appears justified, it is worth noting that other circuits have held that prejudgment interest should ordinarily accrue from the date on which a claimant first filed her claim, rather than from the date on which the claim was denied. *See, e.g., Caldwell v. Life Ins. Co. of North America*, 287 F.3d 1276, 1287 (10th Cir.2002); *Lutheran Med. Ctr. v. Contractors, Laborers, Teamsters & Eng'rs Health & Welfare Plan*, 25 F.3d 616, 623 (8th Cir.1994), *abrogated on other grounds, Martin v. Arkansas Blue Cross & Blue Shield*, 299 F.3d 966, 969, 971–72 (8th Cir.2002) (en banc). In other words, when the filing of a claim renders an indi-

vidual eligible for benefits, the date of filing becomes the date from which prejudgment interest should run. If at least two circuits consider it reasonable to make the date of claim filing the ordinary date of accrual for prejudgment interest, it is certainly reasonable to use that date in exceptional cases in the First Circuit, at least where, as here, that date is also the date on which the claimant becomes eligible for benefits.

The Court reiterates that it is departing from the ordinary rule both to make Radford whole and to prevent unjust enrichment. Even if the First Circuit were to follow the Eighth Circuit in holding that only prevention of unjust enrichment justifies interest for the period of delay, however, the Court would still reach the same result.

### 3. Rate

ERISA is silent on the appropriate rate of prejudgment interest, and First Circuit law affords "broad discretion" to district courts in setting the rate in particular cases. *Cottrill*, 100 F.3d at 225. The exercise of this discretion should be guided by equitable considerations, and both reliance on a state law rate and the federal postjudgment interest rate are reasonable possibilities. *See id.; Colon Velez v. Puerto Rico Marine Mgmt., Inc.,* 957 F.2d 933, 941 (1st Cir.1992) (affirming the district court's use of Puerto Rico's legal rate).

In *Rybarczyk v. TRW, Inc.,* 235 F.3d 975 (6th Cir.2000), the district court awarded prejudgment interest to the claimants in accordance with the following formula:

[T]he greater of (a) interest at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the initial lump sum distribution to the class member, compounded annually, or (b) interest equal to the rate of return actually earned on the principal amount of the underpayment during the prejudgment period.

*Id.* at 981 (alteration in original) (quoting the decision below). The Sixth Circuit affirmed, holding that such an award did not constitute an abuse of the district court's discretion, and noting that "[u]sing the interest rate actually realized by TRW on the relevant funds seems an appropriate way of avoiding unjust enrichment." *Id.* at 985–87. The First Circuit has not spoken on the appropriateness of this method, but it has stated that use of the federal rate (based on Treasury bill rates) was "especially appropriate" in a case where the plan's funds were initially invested in Treasury bills. *Cottrill,* 100 F.3d at 225; *see also Laurenzano,* 191 F.Supp.2d at 236 (citing *Rybarczyk,* 235 F.3d at 985–87). The First Circuit has thus suggested that adoption of an interest rate closely tailored to match an administrator's or fiduciary's actual rate of investment return is well within a district court's discretion.

■■■ Adopting an approach similar to the one in *Rybarczyk*, this Court awarded prejudgment interest at the Massachusetts statutory rate of twelve percent per annum, calculated simply from October 17, 1999 (now revised to June 13, 2000), to March 31, 2004,[25] or at the average rate of

---

**25.** *See* Mass. Gen. Laws ch. 231 § 6C. The statute applies a "rate of twelve percent per annum from the date of the breach or demand." *See id.* Massachusetts cases general-

ly presume that a provision for interest in a statute or contract means simple, not compound interest, absent a clear expression of contrary intent, and equate "per annum" in-

return for First Unum's investments during that period, calculated in a compound manner, whichever is higher.[26] The Massachusetts statutory rate is focused more closely on making Radford whole, · and compound interest based on First Unum's rate of investment return focuses more closely on preventing unjust enrichment, because it closely tracks the profit First Unum actually made from use of Doe's money. Applying the higher of the two effective interest rates ensures that both goals of prejudgment interest are accomplished.

As between the available legislatively determined interest rates, the Court has chosen the Massachusetts rate over the federal postjudgment interest rate articulated in 28 U.S.C. § 1961(a). At least one other judge in this district has held the Massachusetts statutory rate to be appropriate. *See Gallagher v. Park W. Bank & Trust Co.*, 951 F.Supp. 10, 14 (D.Mass.1997) (Ponsor, J.) ("This court will adopt the 12 percent rate of Mass. Gen. L. ch. 231, § 6C. As plaintiffs have argued, it would be inequitable for a breach of an obligation to pay funds owed under a pension contract in Massachusetts to generate less interest than a breach of a simple contract."). The state rate reflects the Massachusetts legislature's considered view of the likely rate of return on invested capital and the cost of borrowing money, under the particular economic conditions of this state. Both may well approximate First Unum's rate of return, particularly because interest is not compounded, and therefore prevent unjust enrichment. To the extent the denial of benefits denied Doe an opportunity to invest, or compelled him to borrow money, the Massachusetts statutory rate tends to make Radford whole.

Other courts have used the less-generous federal rate for postjudgment interest to fix a rate for prejudgment interest. *See, e.g., Cottrill,* 100 F.3d at 224–25 (affirming the use of the federal rate in a Rhode Island case); *Vickers v. Principal Mut. Life Ins. Co.,* 993 F.Supp. 19, 21 (D.Mass.1998) (Gorton, J.); *Celi v. Trustees of Pipefitters Local 537 Pension Plan,* 975 F.Supp. 23, 29 & n. 4 (D.Mass.1997) (O'Toole, J.). Although a uniform national rule may be desirable in some ways, *see Cottrill,* 100 F.3d at 225, it is difficult to see why this would be more true than in other cases where federal law does not provide a rate for prejudgment interest. Admittedly, ERISA preempts state law more broadly than most federal statutes, and it may seem that Congress therefore particularly desired uniformity. Still, Congress could easily have provided an express rule of decision for prejudgment interest, so its failure to do so may also

---

terest with simple interest. *See Coupounas v. Madden,* 401 Mass. 125, 132, 514 N.E.2d 1316 (1987) (contract); *Inhabitants of Tisbury v. Vineyard Haven Water Co.,* 193 Mass. 196, 198, 79 N.E. 256 (1906) (statute); Jordan L. Shapiro, Marc G. Perlin & John M. Connors, *Collection Law, Massachusetts Practice Series,* § 7:27 (2004); *see also Coupounas,* 401 Mass. at 132, 514 N.E.2d 1316 (citing *Tisbury* as authority for a presumption against compound interest). *But see Ellis v. Sullivan,* 241 Mass. 60, 64, 134 N.E. 695 (1922) (permitting compounding of interest on a note in an equity case, despite the absence of any express provision for compound interest, where it was

"necessary for the purpose of affording a just and equitable accounting"). Given that prejudgment interest is an equitable determination in ERISA cases, Massachusetts law suggests that in some cases it would be consistent with Massachusetts statutory policy for a federal court to apply a twelve percent compound rate, even though simple interest is the rule in actions at law.

**26.** To the extent this was not clear from the judgment the Court will make it clearer in the amended judgment.

suggest a desire for state law to provide the rule of decision.

The best answer is probably that Congress either did not consider this issue or decided that it should be left to courts' discretion, consistent with ERISA's purposes. The Court therefore held that, at least in this case, application of the Massachusetts statutory rate better served ERISA's goals of making claimants whole and preventing unjust enrichment.

### I. Attorney's Fees

Attorney's fees are available but not obligatory in ERISA cases, and district courts have significant discretion in making the relevant determinations. 29 U.S.C. § 1132(g)(1); *Cottrill*, 100 F.3d at 223. A flexible five-factor test governs the exercise of the Court's discretion:

> (1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (3) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merits of the parties' positions.

*Cottrill*, 100 F.3d at 225. These factors are "exemplary rather than exclusive." *Id.* There is no presumption of attorney's fees to the prevailing party. *Id.* at 226.

 As this Court has described, First Unum acted in bad faith in denying benefits to Doe, and while First Unum's position was entirely without merit, Radford's was essentially correct. The company can well afford to pay a fee award, and the awarding of fees against insurers acting in bad faith would deter similar conduct by other insurers in the future. The Court has no information before it as to whether the Policy is still in effect for Hawkins

employees, but to the extent that other participants and beneficiaries exist, the decision that has resulted from the bringing of this case ought certainly change First Unum's practice of denying valid claims based on an erroneous and highly restrictive interpretation of the Policy. Moreover, participants and beneficiaries in other plans, particularly those administered by First Unum, will tend to benefit in a similar manner from this lawsuit. The Court therefore held that attorney's fees were appropriate, and ordered the parties to submit papers regarding the appropriate amount.

### J. Costs

The analysis for costs is essentially the same as for attorney's fees, as the two are both governed by 29 U.S.C. § 1132(g)(1), so the Court's analysis of the attorney's fees question led it to award costs to Radford and to order the parties to file papers regarding the appropriate amount.

### K. Postjudgment Interest

The Court further held that Radford was entitled to postjudgment interest at the federal statutory rate. *See* 28 U.S.C. 1961(a); Federal Reserve Statistical Release, http://www.federalreserve.gov/releases/h15/Current/ (last visited Mar. 31, 2004).

### L. Radford's Motion to Amend the Judgment

 Since the Court issued its judgment in this case, Radford filed a Motion to Amend Judgment. Radford urges that the Court should apply prejudgment interest, under the formula discussed above, to any additional benefits Doe may ultimately procure by establishing that his disability does not fall within the Mental Illness provision in the Policy. *Id.* The Court

deliberately avoided doing this in its original judgment, however, and Radford has not persuaded the Court to change its mind.

It was appropriate to hold that Doe was "disabled" for purposes of the Policy from the date of disability until March 31, 2004, to ensure that First Unum could not avoid payment of benefits by pointing to lack of proof. The First Circuit has endorsed this form of remedy. *See Cook*, 320 F.3d at 25. By so holding, and by making any determination that Doe falls outside the confines of the Mental Illness provision apply retroactively, the Court also ensured that Radford and First Unum would be placed in the position they would have occupied had First Unum not wrongfully denied Doe's claim in the first place. The Court can reasonably hold that Doe would have submitted the required continuing proof, had First Unum acted properly, and that he would have sought to avoid application of the Mental Illness provision in a sufficiently timely manner to avoid any disruption in receipt of benefits, because such holdings are necessary to remedy the effects of misconduct in which First Unum has already engaged.

A determination regarding prejudgment interest for First Unum's future conduct would exceed the Court's powers, however; it would be too speculative at this point in time, and any controversy in that regard simply is not ripe. The Court has not spoken as to whether application of the Mental Illness provision would be correct or even reasonable, and there is no way to know how that controversy will be resolved, how promptly any decision will be reached, whether First Unum or a court will reach it, whether the laws governing prejudgment interest will be the same when any decision is reached, and whether the factors the Court has discussed in this opinion will apply in the same way to First Unum's future conduct. *See Jones*, 223 F.3d at 140–41.

## III. CONCLUSION

For the reasons stated, the Court DENIED First Unum's Motions for Summary Judgment [Doc. Nos. 13, 30], ALLOWED Radford's Motion for Partial Summary Judgment [Doc. No. 16], and entered Judgment for Radford as to Count I of Radford's Complaint [Doc. No. 1]. Radford's Motion to Amend Judgment [Doc. No. 39] is DENIED. The Court will issue an Amended Judgment clarifying the appropriate calculation of prejudgment interest forthwith.

SO ORDERED.